**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| | ) | |
| **v.** | ) | **CRIMINAL NO. H-13-363** |
| | ) | |
| | ) | |
| **JAMES WAYNE HAM** | ) | |

**MOTION FOR SANCTIONS AND OTHER APPROPRIATE RELIEF**
**AGAINST DOJ AND DOJ ATTORNEY JAMES D. PETERSON FOR FAILURE TO**
**SELF-REPORT HIS VIRGINIA STATE BAR REPRIMAND AND JUDICIAL**
**FINDINGS OF *BRADY* VIOLATIONS TO THIS COURT**

In February of 2020, attorney Kimberly C. Stevens was contacted by a witness in Virginia who had seen the Houston Chronicle article covering this Court's June 19, 2019 hearing in this case. Exhibit 10. Because that witness came forward, we have learned: On March 12, 2014, the Virginia State Bar issued a private reprimand against James Dennis Peterson for committing *Brady* violations while prosecuting a criminal case in Stafford, Virginia. Exhibits 1, 2, 3 and 4.

On June 19, 2019, this Court required the Government to produce to the defendant and this Court: "You know, the notes of the discussion about the use of the perjured testimony could have been argued to have been attorney/client privilege except committing a crime is not covered; **and while not all violations of bar rules and ethics are crimes, we need to see those**." Transcript, at 34 (emphasis added). The Court continued: "Well, let's get this, what we've discussed today; and I will do a written order on a couple of those things, but what I said here is binding." Transcript, at 45.

1

On June 24, 2019, this Court further ordered the Government to answer, among other things: "3. By July 12, 2019, the government must file a statement about whether there are complaints by the Capital Case Section attorney in this case." Doc. 138, Paragraph 3. In response, the Government answered: "The Government contacted Richard Burns, Acting Chief of the Capital Case Section, regarding whether there were any complaints against Capital Case Section Attorney, James Peterson. According to Richard Burns, other than the complaints made by Amanda Haines, about which this Court is aware, there have been **no complaints** against James Peterson during his tenure with the Department of Justice." Doc. 142 at 1 (emphasis added).[1] Mr. Peterson failed to properly answer the Court's question.

In Document 131, filed on April 12, 2019, the defense noted that the Court has a Pro Hac Vice form which applies to out-of-state private attorneys seeking to practice in the Southern District of Texas: "Being a government attorney, Mr. Peterson did not fill this out (or if he did, he did not file the form in this case). The Pro Hac Vice Form asks the following question of private attorneys: '**has applicant been sanctioned by any bar association or court?** Yes__ No __. On a separate sheet for each sanction, please supply the full particulars.'" Document 131, at 3, fn1 (emphasis added). That form was filed as Document 131, Exhibit 7.

Mr. Peterson was on notice that the issue of whether he had ever been sanctioned by any bar association or court was a relevant issue in the June 19, 2019 hearing. Yet, Mr. Peterson sat through the entire hearing and disclosed nothing. "Peterson, seated with fellow counsel, looked flushed and shook his head. He never addressed the judge nor did he look up from the table during the scolding." Exhibit 10 at 3. Mr. Peterson did not report his Virginia State Bar

---

[1] Similarly, in Document 144, in response to this Court's Order, the Government issued this blanket statement: "There has been no destruction or withholding of Brady information in the case of *United States v. James Wayne Ham*. Additionally, there has been no discovery failures. All discovery items, in the possession of the United States have been produced to the Defense." Document 144, at 5. This issue will be addressed further below.

reprimand to this Court during the hearing. He could have asked to approach the bench in order to inform the Court of this matter. He could have disclosed the matter in open court. Instead, he said nothing. Mr. Peterson has not corrected the record or reported his reprimand since this Court's Order in July of 2019. Instead, because of the private nature of the reprimand, the defense had to discover the reprimand from external sources. It is notable that since our last hearing, and as of July 12, 2019 when undersigned counsel checked the Texas State Bar website, Mr. Peterson has surrendered his Texas Bar license completely.

When this Court said that all violations of bar rules and ethics should be disclosed, the Court was clear. Mr. Peterson had the opportunity right then to inform the court of his Virginia State Bar reprimand.

Mr. Peterson was reportedly hired by the DOJ in 2012. Exhibit 5. On March 12, 2014, the Sixth District Subcommittee of the Virginia State Bar issued a private reprimand to James Dennis Peterson for his role in the prosecution of Antonio C. Navarro-Covert. Exhibit 1. We understand that the reprimand was for Mr. Peterson's *Brady* violations committed in the trial of that defendant's assault case. Exhibit 3, Paragraph 8. A Circuit Court Judge in the County of Stafford, Virginia, who presided over the original trial, found that Mr. Peterson violated *Brady* by failing to turn over exculpatory witness statements, and granted that defendant a new trial. The judicial findings of the *Brady* violations in that case will be discussed further below. Exhibit 2. The family of the defendant in the Navarro case then filed a Bar grievance, and the Virginia State Bar issued a reprimand during Mr. Peterson's tenure with the DOJ.

Moreover, this Court ordered the Government to give Mr. Ham, by July 22, 2019, "all documents relating to the government's withholding and destruction of Brady information or discovery failures in this case." Document 138, Paragraph 5. In response, the Government

3

claims that *Brady* has not been violated in this case, nor have there been any discovery failures, and that "[a]ll discovery items, in the possession of the United States have been produced to the defense." Doc. 114 at 5.

As this Court noted previously: "And the point of the Rogers case was not that the facts of that case in terms of the offense are relevant, but that the government process is tainted by character that doesn't change from case to case. The lawyers in Ohio or wherever it was that tried [Senator Ted] Stevens had probably done the same thing in thousands of cases. Just an honest FBI agent in those cases didn't go to the Judge." 6/19/19 Pre-Trial Hearing Transcript at 25. Further: "Donald Rumsfeld said, the problem's not what we know we don't know, it's what we don't know we don't know." *Id*. at 28.

Given Mr. Peterson's failure to disclose his Virginia State Bar reprimand to this Court, his administrative suspension of his Texas Bar license, and his conduct attested to by co-worker Amanda Haines in the *Rogers* case (covered at length in Document 129), the only way to assess the accuracy of the Government's assurances that *Brady* has been complied with is for the defense to be provided with Mr. Peterson's entire file and compare it with those statements.

### I.  Mr. Peterson's *Brady* Violation in *Commonwealth of Virginia v. Antonio Navarro-Covert*

In the year preceding his employment with the Department of Justice, while serving as an Assistant Commonwealth's Attorney in Stafford, Virginia, James Dennis Peterson prosecuted a young man named Antonio Navarro-Covert. On November 9, 2011, Mr. Navarro-Covert was convicted by a jury and sentenced to more than six years for an alleged assault on Nick Goss.

Prior to trial, the victim of the crime, Nick Goss, described his assailant to law enforcement as a dark-skinned black male. Navarro-Covert is a light skinned white and Hispanic male. Exhibit 6. Mr. Peterson did not turn that statement over to the defense before trial. Mr.

4

Peterson obtained the conviction without calling victim Goss as a witness.  After trial, Goss signed an affidavit saying Navarro-Covert was not his assailant, and he was sorry that the wrong person had been convicted. Exhibit 6.

Further, Mr. Peterson did not turn over a pre-trial statement by a witness named Shannon Jackson.  Her pre-trial statement indicated that she was outside when the melee occurred, and she did not mention seeing Navarro-Covert assault anybody.  In another document, Jackson reportedly said to another person that Mr. Peterson pressured her into providing false testimony, and to have her testimony "mirror" the others.  Exhibit 7.  Neither did Mr. Peterson turn these documents over to the defense prior to trial.

After filing a motion alleging that Mr. Peterson did not produce exculpatory *Brady* evidence before or during trial, Navarro-Covert's conviction was set aside.  On May 2, 2012, the trial judge granted the motion for new trial, holding:

> The burden is on the Commonwealth to produce *Brady* evidence, it's not up to defense counsel to know about statements and ask for them, and then cause the Commonwealth to go looking for statements and give them.  It's up to the Commonwealth to know what the statements are and to give them, that's the focus of Brady and the progeny.  And defense counsel is entitled to a full arsenal of potentially exculpatory evidence before the trial so that he can develop his trial strategy, and his cross examination, and calling of witnesses based on full knowledge of what the evidence is that has been given to agents of the Commonwealth before the trial.
>
> The Commonwealth's position in this case seems to be, well, maybe he didn't assault Goss, but he assaulted somebody, and other people assaulted somebody anyway, so it really doesn't make any difference, he is guilty.  And I just don't think that's true in this case.  I heard the evidence in the trial, obviously, and I was convinced this defendant pushed Nick Goss off the wall, and that that started the fight, and I suspect the jury was convinced of that.  Would it have made a difference if they had known that he wasn't the person, or had evidence from which they could find that he wasn't the person, I think that's a reasonable probability that it would have made a difference to them.

Exhibit 2 at 3-4 (Transcript pages 41-42). Subsequently, the defendant and his family presented evidence of the *Brady* violation to the Virginia State Bar, and on March 12, 2014, Mr. Peterson was reprimanded. Exhibits 1, 3.

## II. Mr. Peterson's Lack of Disclosure Regarding His Texas and Virginia Bar Licenses and Reprimand

Mr. Ham filed a Motion for Discovery on March 26, 2019, in which he noted that a search for Mr. Peterson's Texas bar license status showed that he was ineligible to practice law in the State of Texas due to administrative suspension of his license. Doc. 129 at 3. The government responded that he was formerly licensed in Texas, after a period of years abandoned his Texas bar license, and that the printout Mr. Ham cited to reflected "abandonment not discipline." Doc. 130 at 7. Mr. Ham replied that the Texas State Bar informed undersigned counsel that the bar administratively suspends someone's license if they fail to pay their bar dues, and therefore Mr. Peterson did not properly "abandon" his Texas State Bar license. Mr. Ham further explained that the Texas Disciplinary Rules of Professional Conduct note that a lawyer shall not "engage in the practice of law when the lawyer is on inactive status [including] where a lawyer's right to practice has been administratively suspended for failure to timely pay required fees or assessments…" Doc. 149 at 7 n. 2; TX Disciplinary Rule of Professional Conduct 8.04. The government replied that "at all times during these proceedings James Peterson was a licensed attorney in good standing with the Virginia State bar as required." Doc. 157 at 1.

Additionally, in a footnote in Mr. Ham's reply regarding the discovery motion, Mr. Ham referenced this Court's Pro Hac Vice form, noting that, had Mr. Peterson been a private attorney, he would have had to self-report any bar disciplinary infractions. Document 131, at 3, n1, Exhibit 7 thereto. Neither the government nor Mr. Peterson addressed this statement in

6

subsequent pleadings.  In oral argument on June 19, 2019, Mr. Peterson's Texas bar license status was discussed, including the argument made by the government that Mr. Peterson held a valid Virginia license.  And while his license may technically be valid, that does not excuse Mr. Peterson's failure to report the disciplinary sanction imposed by the Virginia State Bar.  This Court, and the Texas State Bar, have the right to depend upon attorneys to accurately self-report out-of-state disciplinary infractions.

Mr. Peterson, who was present in court, remained silent, again failing to notify the Court about the disciplinary action taken by the Virginia State Bar.  Not only did Mr. Peterson remain silent about the reprimand, but in a reply regarding the discovery motion, the government stated that he was "in good standing with the Virginia state bar" "at all times during these proceedings."  Doc. 157 at 1.

The only way that defense counsel – and now this Court – have been made aware of the *Brady* violation for which Mr. Peterson was reprimanded in Virginia was by a third-party coming forward.[2]  Mr. Peterson has been involved with this case since February of 2015.  Doc. 144, at 1.  His narrative, at document 144, is wholly insufficient to describe his activities in this case.  *See* Doc. 149 for the Defendant's Objections to the Government's Narrative Response to Items 1, 2 and 5.   Mr. Peterson neglects to identify exculpatory information that had to have been learned in his prison interviews; he does not inform the Court of his conversations with James Ham's evaluating psychologist, Maureen Reardon.  The only way that we have learned of

---

[2] Note that Texas Rule of Disciplinary Procedure 15.08(5)(c) states "A private reprimand should not be utilized when a Respondent has engaged in misconduct involving the failure of a prosecutor to make timely disclosure to the defense all evidence or information known to the prosecutor that tends to negate the guilt of the accused or mitigate the offense."  Thus, it appears that, had this reprimand occurred in Texas, it would have been public.  And, Mr. Peterson had an obligation to report his Virginia State Bar disciplinary infraction to the Texas Bar of which he was also a member (albeit a member on administrative suspension). Texas Disciplinary Rule of Professional Conduct 8.03(f).

the suspension of his Texas Bar license, or his Virginia State Bar reprimand, is that the defense discovered them. Similarly, the only way that Mr. Peterson's misconduct in *United States v. Rogers* was discovered was because Amanda Haines was assigned the case after Mr. Peterson had worked on it, and she inherited his file. Doc. 129, Exhibit 1, Haines Declaration, Paragraphs 9-11.

In looking at the timeline of events related to Mr. Peterson's involvement in the *Navarro-Covert* case, the *Rogers* case, and now Mr. Ham's case, they all occurred within relatively quick succession. Mr. Peterson tried the Navarro case in November of 2011; he was hired by the DOJ in 2012 (*see* Exhibit 5); the Virginia State Bar decision was in March 2014 (*see* Exhibit 1); Mr. Peterson was assigned to the *Rogers* case in September 2014; and assigned to Mr. Ham's case in February of 2015 (*see* Doc. 144 at 1). The close proximity of Mr. Ham's case with the Virginia reprimand, and with his work on the *Rogers* case, where there were serious allegations of misconduct, raise reasonable concerns about his conduct during the time frame relevant here, and his conduct during his years of handling Mr. Ham's case. Further, he was faulted in *Rogers* for his conversations with mental health professionals, and a month later he was noted to be dropping off records in Mr. Ham's case for Dr. Maureen Reardon to review. *See* Exhibit 9; 6/19/19 Pretrial Hearing Transcript at 18. Despite this Court's directives, Mr. Peterson has not revealed or described any of his conversations with Dr. Reardon to the defense. It is critical that Mr. Ham have a full understanding of the details of Mr. Peterson's work on Mr. Ham's case through the evidence contained in his file itself.

On June 24, 2019, this Court ordered the government to, among other things, "file a statement about whether there are complaints by the Capital Case Section attorney in this case." Doc. 138. In response, the government stated that, other than the complaints made by Amanda

8

Haines in the *Rogers*, case, "there have been no complaints against James Peterson during his tenure with the Department of Justice." Doc. 142 at 1. Unless "complaint" can fairly be read *not* to include a Bar reprimand (which it cannot – especially given this Court's directive that all bar rule or ethics violations be provided), the Government's statement is inaccurate.

This Court further ordered the Government to draft a statement as to whether *Brady* has been violated here. The government says *Brady* has not been violated in this case, nor have there been any discovery failures, and that "[a]ll discovery items, in the possession of the United States have been produced to the defense." Doc. 114 at 5. We cannot simply accept Mr. Peterson's word for that – given his apparent lack of understanding of, or disregard for, the requirements of *Brady*. Only by review of the underlying documents – his file – can we learn whether exculpatory information on guilt or penalty exists in that file.

### III.    Discovery Requests regarding Mr. Peterson

In the government's Response to Court Order Items 1, 2, and 5, when asked to give a narrative of all Mr. Peterson's activity in Mr. Ham's case, the government states that Mr. Peterson "reached out to and arranged to retain" Mr. Ham's evaluating mental health doctor, Dr. Maureen Reardon. Doc. 144 at 2. His narrative, contrary to this Court's directives, says nothing about what was discussed with Dr. Reardon. His narrative also states that he was present "during pre-competency hearing interviews of prison staff." Doc. 144 at 3. Mr. Ham has not had a single infraction for a violent act while in custody. Those interviews, therefore, *must* contain exculpatory information regarding penalty phase; however, Mr. Peterson provided no detail from those interviews.

Defense counsel has also learned that a number of witnesses were brought to Houston and interviewed, or interviewed by the government and/or law enforcement at another location.

In the course of our investigation, we have identified nine witnesses who have told us that they were interviewed at length by the government, yet we have received no statements from the government summarizing those interviews. That is nine witnesses that we know about – we have no idea how many others exist. No information on these interviews has been provided by the government, and defense counsel does not know who was present during those interviews.

> Recall that in *Rogers*, DOJ Attorney Amanda Haines swore that Mr. Peterson had:

> committed a fundamental error in judgment and a violation of the 'Ogden Memo,' by interviewing over a dozen witnesses without a law enforcement agent or other witness being present. These witnesses were suspected of having information that was potentially harmful to the government's penalty phase case. Mr. Peterson compounded this error by destroying his interview notes, a fact he initially falsely denied, neglecting to memorialize his conversations with the witnesses, and failing to keep records of what documents he showed them to refresh their recollections or lack thereof.

Doc. 129, Exhibit 1, Paragraph 10. Here, the government stated in oral argument that anything that is not work product has been provided to the defense. 6/19/19 Pretrial Hearing Transcript at 24. Defense counsel has not, though, seen any documentation related to these interviews listed above, including who was present, what was said, and whether there is any *Brady* material included in those interviews.

Defense counsel needs Mr. Peterson's complete file to understand the scope of his interviews and his work on this matter. Without it, we cannot test the facts underlying his incomplete narrative and his blanket statement saying no *Brady* violations have occurred here. In Mr. Peterson's Opposition to the Motion to Set Aside Trial in *Navarro-Covert*, he clearly argues for an interpretation of *Brady* that is inaccurate, and that was rejected by the court hearing the motion. There, Mr. Peterson suggested that it was the defense's obligation to request specific statements made by the alleged victim, Nick Goss, or a witness, Shannon Jackson. Mr. Peterson admitted that "[t]he Commonwealth did not provide the defense counsel with Mr. Goss' written

or oral statement to law-enforcement or Shannon Jackson's statement… The defendant never requested to see any Nick Goss statements or other specific witness statements." Exhibit 8 at 2. He further claims that cases dealing with *Brady* don't find materiality when the statements are incomplete and do not exonerate the defendant, but are simply inconsistent with some of the evidence at trial. *Id*. at 4. This is simply not the law, and the Court rejected Mr. Peterson's interpretation when granting a new trial. Exhibit 2 at 3 (Transcript page 41).

Mr. Peterson's misguided interpretation of *Brady* lends all the more support for providing the DOJ's Blue Book to the defense in this case. The defendant has demonstrated his need to review departmental policies as compared with Mr. Peterson's conduct in this Court. Has Mr. Peterson been as cavalier with the application of *Brady* to the evidence in this capital case as he has with his Texas Bar License, his Virginia State Bar reprimand, the local rules of this Court, and his disregard for this Court's orders to produce evidence?

As mentioned above, Mr. Ham has reason to believe there have been witness interviews for which we have seen no reports or notes, and Mr. Peterson himself responded in his narrative that he spoke to Dr. Reardon and prison staff. The responses regarding his role have thus far been incomplete and insufficient, and the defense now requests access to Mr. Peterson's complete file, and the DOJ's Blue Book governing the provision of discovery, as previously briefed in Document 160.

**IV.     Sanctions**

It is within this Court's authority to impose sanctions on the Government for violating the Local Rules for the Southern District of Texas and the Texas Disciplinary Rules of Professional Conduct. In this case, when confronted regarding his apparent suspended Texas Bar license, Mr. Peterson – rather than apologize to this Court and correct the situation – represented to this Court

in a filed responsive document that his license was properly surrendered, when it was not. Rule 8.04 of the Texas Disciplinary Rules of Professional Conduct clearly states that a failure to pay dues is a violation of those rules, and there is no exception for "abandonment" of a license. He has now failed to disclose his Virginia State Bar Reprimand to this Court, upon this Court's request that he do so.

Federal courts enjoy the inherent power to "manage their own affairs so as to achieve the orderly and expeditious disposition of cases." *Chambers v. NASCO, Inc.,* 501 U.S. 32, 43 (1991) (quoting *Link v. Wabash R. Co.,* 370 U.S. 626, 630–31 (1962)). This power includes the ability to discipline attorneys, punish for contempt, control admission to its bar, and vacate judgments. *Id.* at 43–44. It is well established "that a district court always has jurisdiction to impose sanctions designed to enforce its own rules." *Fleming & Assocs. v. Newby & Tittle*, 529 F.3d 631,637–38 (5th Cir. 2008) (citing *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384 (1990)).

The Fifth Circuit has explicitly held that there is no requirement to find bad-faith when imposing sanctions pursuant to a local rule of court. *In re Goode*, 821 F.3d 553, 559 (5th Cir. 2016) ("As we conclude that the district court was not required to make a finding of bad faith before sanctioning Goode under [the local rules], we turn to Goode's constitutional challenge"); *see also In re Hermesmeyer*, 688 F. App'x 300, 304 (5th Cir. 2017). Thus, without regard to Mr. Peterson's good or bad faith in allowing his Texas Bar license to be suspended, his conduct in signing pleadings in the United States District Court for the Southern District of Texas while ineligible to practice law in Texas warrants the sanctions sought here, including that the court strike all pleadings signed by James Peterson in this matter, including the superseding indictment, the amended Notice of Intent to Seek the Death Penalty, the second amended Notice of Intent to Seek the Death Penalty, and every pleading which bears his signature. Further, his

12

failure to report his Virginia State Bar reprimand, following an Order that he do so, is grounds for the sanctions sought below.

Finally, the defense has reason to wonder whether Mr. Peterson reported his Virginia State Bar reprimand to the Texas State Bar. He held a license in Texas (though on administrative suspension for failure to pay dues and, on information and belief, on inactive status) at the time of his Virginia State bar reprimand. The Texas State Bar required that Mr. Peterson self-report his Virginia State Bar reprimand. See Texas Disciplinary Rule of Professional Conduct 8.03(f) ("A lawyer who has been disciplined by the attorney-regulatory agency of another jurisdiction must notify the chief disciplinary counsel within 30 days of the date of the order or judgment. The notice must include a copy of the order or judgment"). And, in Texas, when a prosecutor violates *Brady*, the reprimand cannot be confidential. *See* Texas Rule of Disciplinary Procedure 15.08(5)(c) ("A private reprimand should not be utilized when a Respondent has engaged in misconduct involving the failure of a prosecutor to make timely disclosure to the defense all evidence or information known to the prosecutor that tends to negate the guilt of the accused or mitigate the offense").

**CONCLUSION**

Based on the argument presented above, Mr. Ham believes that the following sanctions are warranted, and respectfully requests that this Court:

1. Order the Department of Justice provide to the defense a copy of Mr. Peterson's entire file from this case;

2. Order the Department of Justice to produce Mr. Peterson's personnel file;

3. Order Mr. Peterson to produce to this Court the contents his entire private reprimand from the Virginia State Bar;

4. Order Mr. Peterson to answer whether he self-reported his Virginia reprimand to the Texas Bar at any time while serving as counsel for the government in this case;

5. Release the "Blue Book" to defense counsel;

6. Order Mr. Peterson and the Department of Justice to produce copies of his and Amanda Haines' complete depositions in *United States v Rogers*;

7. All items previously requested in Documents 129, 143, 149, and 160; and

8. Any and all such other relief as justice requires.

This being a motion for sanctions, the defense has not conferred with the government with respect to whether they consent to the filing of this motion.

Respectfully submitted, this the 5th day of March, 2020.

/s/ *Kimberly C. Stevens*
Kimberly C. Stevens
Capital Resource Counsel
Assistant Federal Public Defender
1070-1 Tunnel Road, STE 10-215
Asheville, NC 28805
(336) 575-4337 – cell
(336) 788-3779 – voicemail
(336) 788-3836 – fax
North Carolina State Bar No. 20156

/s/ *Anthony S. Haughton*
Anthony S. Haughton
Capital Resource Counsel
Assistant Federal Public Defender
C/O SD Federal Public Defender
Lyric Centre
440 Louisiana, Suite 1350
Houston, TX 77004-1669
(832) 287-9548 - cell
(713) 718-4610 - fax
Texas Bar No. 09234150

COUNSEL FOR JAMES WAYNE HAM

14

CERTIFICATE OF SERVICE

This is to certify that on the 5th day of March, 2020, a copy of the foregoing was served on counsel for the United States by electronic transmission.

>*/s/ Kimberly C. Stevens*
>Kimberly C. Stevens
>Capital Resource Counsel
>Assistant Federal Public Defender
>1070-1 Tunnel Road, Suite 10-215
>Asheville, NC 28805
>(336) 575-4337 – cell
>(336) 788-3779 – voicemail
>(336) 788-3836 – fax
>North Carolina State Bar No. 20156

# EXHIBIT 1



# Virginia State Bar

SIXTH DISTRICT COMMITTEE

PLEASE REPLY TO:
Barbara Lanier, Clerk
707 East Main Street
Suite 1500
Richmond, VA 23219-2800

March 12, 2014

PERSONAL AND CONFIDENTIAL

Antonio C. Navarro-Covert #20074451
1301 Dunes Street, Apt. 101
Fredericksburg, VA 22401

Re:  In the Matter of James Dennis Peterson
     VSB Docket No. 12-060-091920

Dear Mr. Navarro-Covert:

Enclosed is a copy of the Subcommittee Determination Private Reprimand by the Sixth District Subcommittee of the Virginia State Bar issued to the Respondent.

A private reprimand is not a matter of public record. Under the Rules of the Virginia Supreme Court, this matter is confidential. I urge you to maintain its confidentiality.

Thank you for your cooperation with the committee.

Very truly yours,

Melanie B. Economou
Chair

KRM:ssd

Enclosure

cc:  Kathryn R. Montgomery, Deputy Bar Counsel

# EXHIBIT 2

ORIGINAL

FILED
BY COUNTY CLERK OF COURT

JUN 1 2 2012
11:59 Am
STAFFORD COUNTY CIRCUIT COURT
STAFFORD, VIRGINIA

1

VIRGINIA:

IN THE CIRCUIT COURT OF THE COUNTY OF STAFFORD

- - - - - - - - - - - - - - - - - - - - -

COMMONWEALTH OF VIRGINIA :

vs.                                    :    CR11000621-00

ANTONIO NAVARRO-COVERT       :

- - - - - - - - - - - - - - - - - - - - -

Complete TRANSCRIPT of the motion and other incidents in the above styled case, when heard on May 2, 2012, at 9:04 a.m., before Honorable J. Howe Brown, Judge.

APPEARANCES:

Mr. James D. Peterson, Attorney at Law
1300 Courthouse Road
Stafford, Virginia  22555
Assistant Commonwealth's Attorney

Mr. James J. Ilijevich, Attorney at Law
Ms. Robin N. Krueger, Attorney at Law
Ilijevich & Krueger, Attorneys at Law
510 Princess Anne Street, Suite 101
Fredericksburg, Virginia  22401
Counsel for the Defendant

The Defendant in Person

Reported by:  Beverly J. Mahoney

FRANCES K. HALEY & ASSOCIATES, Court Reporters
10687 Spotsylvania Avenue, Fredericksburg, VA 22408
Phone:  (540)898-1527   Fax:  (540)898-6154

THE COURT: The burden is on the Commonwealth to produce Brady evidence, it's not up to defense counsel to know about statements and ask for them, and then cause the Commonwealth to go looking for statements and give them. It's up to the Commonwealth to know what the statements are and to give them, that's the focus of Brady and the progeny. And defense counsel is entitled to a full arsenal of potentially exculpatory evidence before the trial so that he can develop his trial strategy, and his cross examination, and calling of witnesses based on full knowledge of what the evidence is that has been given to agents of the Commonwealth before the trial.

The Commonwealth's position in this case seems to be, well, maybe he didn't assault Goss, but he assaulted somebody, and other people assaulted somebody anyway, so it really doesn't make any difference, he is guilty. And I just don't think that's true in

this case.

I heard the evidence in the trial, obviously, and I was convinced that this defendant pushed Nick Goss off the wall, and that that started the fight, and I suspect that the jury was convinced of that. Would it have made a difference if they had known that he wasn't the person, or had evidence from which they could find that he wasn't the person, I think that's a reasonable probability that it would have made a difference to them. And certainly the way that Mr. Ilijevich handled the trial would have been different if he had known what Shannon Jackson had said in a statement previously, and what Nick Goss had said previously.

So I don't think you can just -- I mean, I know this mob statute allows you to find people guilty that just happen to be hanging around with their gang, and as Mr.

Ilijevich openly says, maybe it will turn out the same way, but I think there is a reasonable probability that at least some of those charges won't. And I think it was an important part of this trial, the evidence that he pushed Nick Goss off the wall. And there is certainly at least a reasonable probability that that isn't going to be found next time. So I think there is a reasonable probability of a different result if defense counsel had been armed with the full arsenal of statements that he should have been.

Now, let me say this also. This is not a case where some federal judge is going to yell at the prosecutor, and the prosecutor is going to be forced to resign because he was terrible and all of that. I don't find any nefarious motive on the part of the Commonwealth to hide this. And that isn't what Brady is all about. This is just simply a case where defense counsel was deprived of

information that they should have had, that he should have had, in the full preparation of the trial and defending his client. So the verdict is set aside. And we need to set a trial date. And I don't know that -- I mean, do you want to set a trial date now?

MR. PETERSON: I would like to set a trial date now. And I will offer up to the Court Mr. Goss, who is now in the courtroom. I spoke with him briefly I think last week or the week before, and I believe he is being stationed or sent somewhere for the military in a couple of days, and I would just ask, if Mr. Ilijevich wants, to make inquiry of him for his availability, because, obviously, I don't want it to come up later.

THE COURT: You mean his availability for the next couple of days?

MR. PETERSON: I think he is gone for a while.

THE COURT: Well, what I mean

FRANCES K. HALEY & ASSOCIATES, Court Reporters
10687 Spotsylvania Avenue, Fredericksburg, VA 22408
Phone: (540)898-1527   Fax: (540)898-6154

# EXHIBIT 3

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| VS. | § | CRIMINAL NO. 4:13-cr-00363 |
| | § | |
| JAMES WAYNE HAM | § | |

## DECLARATION OF ANJAULYEKE COVERT BRYANT

I, Anjaulyeke Covert Bryant, having been first duly sworn to under pain and penalty of perjury, do state the following:

1. I am over the age of eighteen years old.

2. I and my family filed a bar complaint with the Virginia State Bar against James Dennis Peterson for his actions arising from the prosecution of my grandson, Antonio C. Navarro-Covert.

3. In that bar proceeding, we alleged that James Dennis Peterson failed to produce Brady evidence in the trial of our grandson, Antonio C. Navarro-Covert.

4. Our grandson was convicted by a jury and sentenced to more than 6 years for an alleged assault. The victim of the assault, Nick Goss, did not testify at trial. Ultimately, we found the victim of the crime, and he said that he had described the assailant to law enforcement as a dark skinned black male. Mr. Goss gave law enforcement this description before the trial. Our grandson is a light skinned white and Hispanic male.

5. When we learned of this statement, we hired an attorney. The attorney filed a motion alleging that James Dennis Peterson did not produce this exculpatory Brady evidence before or during the trial. Our grandson's conviction was set aside.

6. We presented this information to the Virginia State Bar.

7. We received notice from the Virginia State Bar that on March 12, 2014, the Sixth District Subcommittee of the Virginia State Bar made a decision after a year-long investigation.

8. Our understanding is that the Virginia State Bar issued a private reprimand to James Dennis Peterson as a result of his failure to produce the Brady evidence during my grandson's jury trial. The case was called In the Matter of James Dennis Peterson, VSB Docket No. 12-060-091920, regarding Antonio C. Navarro-Covert. The Bar

urged us to maintain the confidentiality of reprimand, and so we did not show the reprimand our give a copy to counsel for James Ham, nor did they ask us to see the contents of the reprimand.

*Anjaulyeke Bryant -Covert*

*Feb 11, 2020*

SWORN TO AND SUBSCRIBED BEFORE ME, a notary public in the State of South Carolina, County of Richland, on this the 11th day of February, 2020 by Anjaulyeke Covert Bryant, to certify which, witness my hand and seal of office.

*9/24/2015*

Notary Public in and for the State of South Carolina

**EXHIBIT 4**

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| VS. | § | **CRIMINAL NO. 4:13-cr-00363** |
| | § | |
| JAMES WAYNE HAM | § | |

## AFFIDAVIT OF BRANDI RIDDLE

I, Brandi Riddle, having been first duly sworn, under pain and penalty of perjury, do state the following:

1. I am over the age of eighteen years old.

2. I am an investigator working on the case of *United States v. James Wayne Ham.*

3. On February 11, 2020, I saw a cover letter from the Virginia State Bar addressed to Antonio Navarro-Covert, stating that a private reprimand was issued by the Virginia State Bar against James Dennis Peterson. The cover letter was captioned, In the Matter of James Dennis Peterson, VSB Docket No. 12-060-091920. The letter is dated March 12, 2014. Mr. Navarro-Covert informed me that he was the complainant in the matter.

4. I witnessed that, stapled to the cover letter from the Virginia State Bar, was a multi-page document. The cover letter from the Virginia State Bar stated that the contents of the reprimand were confidential under the rules of the Virginia Supreme Court and the language urged Mr. Navarro-Covert to maintain its confidentiality. Therefore, I did not read the contents of the document attached to the cover letter. The complainant and his family explained to me that the attachment was in fact a reprimand against Mr. Peterson, for Peterson's *Brady* violation in Mr. Navarro-Covert's case.

5. A true and accurate copy of the cover letter was provided to me, Ms. Stevens and Mr. Haughton with the complainant's permission, and is attached to this Affidavit as Exhibit A.

6. On February 12, 2020, I went to the Stafford County Courthouse and copied the following pleadings related to the case of the *Commonwealth of Virginia v. Antonio Navarro-Covert*, In the Circuit Court of the County of Stafford, Case No. CR11-0621-00 *et al.* True and accurate copies of each pleading referenced with an exhibit letter are attached to this Affidavit:

   a. May 2, 2012 Order Vacating Charges and Setting New Trial (Exhibit B);

   b. May 2, 2012 Transcript and Judicial Findings on Defense Motions to Dismiss, wherein the court finds *Brady* violations requiring a new trial; pages 1, 41-44 (Exhibit C);

c. February 14, 2012 Defense Motion to Set Aside Jury Verdict. This motion included an attached affidavit of victim, Nick Goss. Goss' affidavit states that the suspect he described as assaulting him was a tall, dark skinned, black male with a high-top fade. After viewing a photograph of Antonio Navarro-Covert, Goss stated that Antonio (the defendant who was convicted) did not assault him. (Exhibit D);

d. March 1, 2012 Defense Motion to Reconsider Sentence;

e. March 22, 2012 Defense Motion to Set Aside Verdict for Non-Disclosure of Exculpatory Evidence; and

f. March 30, 2012 Commonwealth's (James D. Peterson's) Opposition to Motion for New Trial.

g. I can provide true and accurate copies of the documents listed at (d), (e), and (f) above upon request, but have not attached them here due to their length.

3/2/2020

_____
Brandi Riddle

SWORN TO AND SUBSCRIBED BEFORE ME, a notary public in the State of South Carolina, County of Richland, on this the **2nd** day of March, 2020 by **Jennie Crider**, to certify which, witness my hand and seal of office.

_____
Notary Public in and for the State of South Carolina

My Commission Expires May 12, 2026

# EXHIBIT A



# Virginia State Bar

SIXTH DISTRICT COMMITTEE

PLEASE REPLY TO:
Barbara Lanier, Clerk
707 East Main Street
Suite 1500
Richmond, VA 23219-2800

March 12, 2014

PERSONAL AND CONFIDENTIAL

Antonio C. Navarro-Covert #20074451
1301 Dunes Street, Apt. 101
Fredericksburg, VA 22401

Re:  In the Matter of James Dennis Peterson
     VSB Docket No. 12-060-091920

Dear Mr. Navarro-Covert:

Enclosed is a copy of the Subcommittee Determination Private Reprimand by the Sixth District Subcommittee of the Virginia State Bar issued to the Respondent.

A private reprimand is not a matter of public record. Under the Rules of the Virginia Supreme Court, this matter is confidential. I urge you to maintain its confidentiality.

Thank you for your cooperation with the committee.

Very truly yours,

Melanie B. Economou
Chair

KRM:ssd

Enclosure

cc:   Kathryn R. Montgomery, Deputy Bar Counsel

# EXHIBIT B

**VIRGINIA:**

IN THE CIRCUIT COURT FOR THE COUNTY OF STAFFORD,

HELD ON THE 2ND DAY OF MAY, 2012

PRESENT: THE HONORABLE J. HOWE BROWN, JR., JUDGE

**COMMONWEALTH OF VIRGINIA**　　　　　　CASE # CR11000621-00, 03 & 04

　　　　　　　　　　　　　　　　　　　　　OFFENSE DATE 3-16-11

v.　　　　　　　　　　　　　　　　　　　　D.O.B. 10-22-89

　　　　　　　　　　　　　　　　　　　　　SSN: 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

**ANTONIO NAVARRO-COVERT**

## ORDER

**THIS DAY** came the Defendant, Antonio Navarro-Covert, who was led to the bar in the custody of the Sheriff, and who stands convicted of a felony, to-wit: participation in criminal gang activity, in violation of Section 18.2-46.2 of the Code of Virginia, and 2 misdemeanors, to-wit: assault by mob, in violation of Section 18.2-42 of the Code of Virginia and assault & battery, in violation of Section 18.2-57 of the Code of Virginia, and came his attorney, James Ilijevich and the Attorney for the Commonwealth.

Thereupon, the Defendant, by counsel, moved the Court to set aside the jury verdicts and findings of guilt in this case, and having heard the evidence and the argument of counsel, such motion is granted over the objection of the Attorney for the Commonwealth, for reasons as stated to the record.

Whereupon, it is hereby ordered that the findings of guilt in the above stated charges are hereby vacated and this case is set for a new trial with a jury on July 18, 2012 at 10:00 a.m. and July 19, 2012 at 9:00 a.m.

The Defendant was remanded to the custody of the Sheriff.

**ENTERED THIS _2_ DAY OF MAY 2012**

_J. Howe Brown_

**J. Howe Brown, Jr., Judge Designate**

# EXHIBIT C

ORIGINAL

FILED
BY COUNTY CLERK OF COURT

JUN 1 2 2012
11:59 Am
STAFFORD COUNTY CIRCUIT COURT
STAFFORD, VIRGINIA

1

VIRGINIA:

IN THE CIRCUIT COURT OF THE COUNTY OF STAFFORD

- - - - - - - - - - - - - - - - - - - - - - - -

COMMONWEALTH OF VIRGINIA :

vs.                              :    CR11000621-00

ANTONIO NAVARRO-COVERT     :

- - - - - - - - - - - - - - - - - - - - - - - -

Complete TRANSCRIPT of the motion and other incidents in the above styled case, when heard on May 2, 2012, at 9:04 a.m., before Honorable J. Howe Brown, Judge.

APPEARANCES:

Mr. James D. Peterson, Attorney at Law
1300 Courthouse Road
Stafford, Virginia  22555
Assistant Commonwealth's Attorney

Mr. James J. Ilijevich, Attorney at Law
Ms. Robin N. Krueger, Attorney at Law
Ilijevich & Krueger, Attorneys at Law
510 Princess Anne Street, Suite 101
Fredericksburg, Virginia  22401
Counsel for the Defendant

The Defendant in Person

Reported by:  Beverly J. Mahoney

FRANCES K. HALEY & ASSOCIATES, Court Reporters
10687 Spotsylvania Avenue, Fredericksburg, VA 22408
Phone:  (540)898-1527   Fax:  (540)898-6154

THE COURT: The burden is on the Commonwealth to produce Brady evidence, it's not up to defense counsel to know about statements and ask for them, and then cause the Commonwealth to go looking for statements and give them. It's up to the Commonwealth to know what the statements are and to give them, that's the focus of Brady and the progeny. And defense counsel is entitled to a full arsenal of potentially exculpatory evidence before the trial so that he can develop his trial strategy, and his cross examination, and calling of witnesses based on full knowledge of what the evidence is that has been given to agents of the Commonwealth before the trial.

The Commonwealth's position in this case seems to be, well, maybe he didn't assault Goss, but he assaulted somebody, and other people assaulted somebody anyway, so it really doesn't make any difference, he is guilty. And I just don't think that's true in

this case.

I heard the evidence in the trial, obviously, and I was convinced that this defendant pushed Nick Goss off the wall, and that that started the fight, and I suspect that the jury was convinced of that. Would it have made a difference if they had known that he wasn't the person, or had evidence from which they could find that he wasn't the person, I think that's a reasonable probability that it would have made a difference to them. And certainly the way that Mr. Ilijevich handled the trial would have been different if he had known what Shannon Jackson had said in a statement previously, and what Nick Goss had said previously.

So I don't think you can just -- I mean, I know this mob statute allows you to find people guilty that just happen to be hanging around with their gang, and as Mr.

Ilijevich openly says, maybe it will turn out the same way, but I think there is a reasonable probability that at least some of those charges won't. And I think it was an important part of this trial, the evidence that he pushed Nick Goss off the wall. And there is certainly at least a reasonable probability that that isn't going to be found next time. So I think there is a reasonable probability of a different result if defense counsel had been armed with the full arsenal of statements that he should have been.

Now, let me say this also. This is not a case where some federal judge is going to yell at the prosecutor, and the prosecutor is going to be forced to resign because he was terrible and all of that. I don't find any nefarious motive on the part of the Commonwealth to hide this. And that isn't what Brady is all about. This is just simply a case where defense counsel was deprived of

information that they should have had, that he should have had, in the full preparation of the trial and defending his client. So the verdict is set aside. And we need to set a trial date. And I don't know that -- I mean, do you want to set a trial date now?

MR. PETERSON: I would like to set a trial date now. And I will offer up to the Court Mr. Goss, who is now in the courtroom. I spoke with him briefly I think last week or the week before, and I believe he is being stationed or sent somewhere for the military in a couple of days, and I would just ask, if Mr. Ilijevich wants, to make inquiry of him for his availability, because, obviously, I don't want it to come up later.

THE COURT: You mean his availability for the next couple of days?

MR. PETERSON: I think he is gone for a while.

THE COURT: Well, what I mean

FRANCES K. HALEY & ASSOCIATES, Court Reporters
10687 Spotsylvania Avenue, Fredericksburg, VA 22408
Phone: (540)898-1527 Fax: (540)898-6154

# EXHIBIT D

V I R G I N I A:

IN THE CIRCUIT COURT OF THE COUNTY OF STAFFORD

COMMONWEALTH OF VIRGINIA            :

            Complainant            :

v.

                       :CaseNo.CR11-0621-00, ET AL

ANTONIO C. NAVARRO-COVERT            :

            Defendant            :

## MOTION TO TO SET ASIDE VERDICT

Please take notice that, on February 15, 2012 at 9:00 a.m, the defendant, by counsel, will present a Motion to Set Aside the Verdict of this matter, following a jury trial on November 3, 2011.

As grounds for this motion, defendant states the following:

- This case was heard by a jury on November 3, 2011. At the conclusion of the evidence, the jury found the defendant guilty of gang activity, in violation of Va. Code §18.2-46.2, assault, in violation of Va. Code Ann. §18.2-57(A) and assault by mob, in violation of Va. Code §18.2-42. The jury recommended a sentence and the matter is awaiting sentencing.

- The alleged victim of the assault, Nick Goss, has since indicated that he was not assaulted by the defendant. (see attached affidavit) The Commonwealth never offered to the defendant that there was any doubt about the identity of Goss'

2-15 CR3

assailant.

- The Commonwealth's expert witness on gangs, Detective Hopkins, has subsequently testified under oath differently about the 'gang' identified as 'Goon Squad.' (see attached transcript from preliminary hearing of Belinda Yates, dated 1/11/12) This witness' testimony about the existence of a gang was obviously a crucial consideration by the jury when considering its verdict.

- Additionally, the defendant states that the Commonwealth failed to prove its case against him on the charge of assault by mob and gang participation.

The Defendant respectfully requests that this Court set aside the jury's finding of guilt. To find a person guilty of assault by mob, the Commonwealth must prove that he or she was part of of group that formed with the *common* intent to commit an assault and battery. Harrell v. Commonwealth, 11 Va. App. 1, 396 S.E.2d 680 (1990)  All of the evidence, both from the commonwealth and from the defendant indicated that the defendant and his friends were at a party engaging others peacefully.  A statement of a co-defendant admitted into evidence indicated no prior intent to commit an assault.  With regard to the assault, the Commonwealth's evidence only indicates the act of an individual, not a group.  Therefore, the jury did not have sufficient evidence to find the defendant guilty of assault by

mob.

This lack of proof is also fatal to the Commonwealth's case regarding the conviction for gang activity. To sustain a conviction under Va. Code §18.2-46.2, gang activity, the Commonwealth must show that the existence of a gang and that a person who knowingly and willfully participates in in any predicate criminal act for the benefit of, at the direction of, or in association with any criminal street gang. Corrado v. Commonwealth, 47 Va. App. 315, 623 S.E.2d 452 (2005) Again, the Commonwealth's evidence failed to show that the actions of the defendant at the party in Stafford County were in any way related to his alleged gang participation.

Similarly, the Commonwealth failed to properly establish the existence of a criminal street gang as required by Va. Code Ann. §18.2-46.1. At trial, Detective Hopkins could not identify any of the elements of a gang, specifically sign, symbol, or creed which he could attach to the 'goon squad'. Additionally, and significantly, at a later hearing, under oath, he testified that 'goon squad' was a group with 'identifiable name, sign and symbol.' This difference in testimony calls into question his opinion that the 'goon squad' was actually a criminal street gang, a necessary element under Va. Code Ann. §18.2-46.1 and §18.2-46.2.

Finally, the Commonwealth prosecuted the defendant for assault and battery of one Nick Goss. Nick Goss has, subsequent

to the trial indicated that he was not asked to identify the defendant by the Commonwealth and now states that the defendant was not the person who assaulted him by pushing him off a wall. Additionally, he says he identified his assailant as tall and dark skinned; the defendant is a light skinned Hispanic male.

The defendant respectfully requests that Court grant the defendant relief by setting aside the verdict reached by this Court at the conclusion of the defendant's trial.

Respectfully Submitted,
ANTONIO NAVARRO-COVERTY
By Counsel

James J. Ilijevich, Esq.
510 Princess Anne Street. Suite 101
Fredericksburg, VA   22401
(540) 310-0045

## CERTIFICATE OF SERVICE

I hereby certify that on the 14th day of February, 2012, I hand delivered a true copy of the foregoing Notice and Motion to the Commonwealth's Attorney for the County of Stafford, Virginia.

James J. Ilijevich
510 Princess Anne Street, Suite 101
Fredericksburg, VA   22401
(540) 310-0045

## AFFIDAVIT

Commonwealth of Virginia

Nick Goss personally appeared before me in Stafford, VA

Betsy Sonnier this 5th day of ~~October, 2011~~ February 2012 who being
Notary

by me first duly sworn, on her/his oath to the following:

On April 16, 2011 I was at a party in Stafford and saw an individual who I now know as Antonio Curtis Covert' Navarro who was accused of assault and battery on me. Now that I (Nick Goss) have seen a picture of Antonio Curtis Covert' Navarro I swear it is not him that assaulted me. In fact I saw him that night and he wasn't even fighting. The suspect that I described as assaulting me was a tall, dark skinned, black male with a high top fade. I learned of his name by the newspaper and that is why I thought it was him that assaulted me. I was never shown his picture before, until, now. I'm sorry that the wrong man has been convicted of a crime he did not commit. This is the picture of Antonio Curtis Covert' Navarro shown to me this day.



Signed _____
       Nick Goss

Address_

    _

Phone _

Betsy Sonnier
Notary Public
Commonwealth of Virginia
Commission #: 7226540
My Commission Expires July 31, 2012

Sworn before me, This 5th day of ~~October, 2011.~~ February 2012

Seal

_____ my commission expires 7/31/12

**EXHIBIT 5**

each contributes to the death.[26]

The government also asked for, and received the following instruction:

> If the defendant's conduct placed Kee Smith in a position of danger, and the defendant failed to safeguard Kee Smith, the defendant's conduct should be regarded as having caused the death of Kee Smith.[27]

The Tenth Circuit affirmed the correctness of both instructions and held that "[w]hen a person puts another in a position of danger, he creates for himself a duty to safeguard or rescue the person from that danger."[28]

# VI. Back to the Vaughn Prison Riot

Revisiting the facts of the Vaughn Prison Riot in the context of aiding and abetting and *Pinkerton* liability shows how flexible and plastic those concepts can be in order to achieve justice for those who participated in the riot that resulted in the murder of Officer Floyd. Those who agreed to participate in the riot share responsibility for Officer Floyd's foreseeable death. Those inmates who agreed to participate in the ruse to lure Officer Floyd to try to break up a fight are responsible for his kidnapping, assault, and murder under a *Pinkerton* liability theory. Likewise, all inmates who practiced and participated in the riot may share *Pinkerton* liability for the kidnappings, assaults, and murder. Concerning the inmates participating in the detention, assault, and intimidation of correction officers Tuxward, Hammond, McCall, and Floyd, all are responsible for the kidnappings, assaults, and murder under a *Pinkerton* liability theory, as well as under aiding and abetting law.

Although the Vaughn Prison Riot is one of the more recent and serious examples of mass violence resulting in death, the state prison riot at Vaughn is not unique to the state system. On May 20th, 2012, as many as 300 inmates were involved in a riot that resulted in the death of one guard and injury to five other correctional officers and three inmates at the Adams County Correctional Center, a federal penal facility operated by a private corporation in Mississippi. In 1987, thousands of inmates rioted and took control of the U.S. Penitentiary in Atlanta, Georgia, for eleven days. Fortunately, no innocent staff or inmate lives were lost. More common, and more relevant to this article, are the many murders and serious assaults that take place each year in federal prison facilities. Aiding and abetting and *Pinkerton* conspiracy liability should be fully explored in order to hold accountable all inmates who participate in these violent crimes.

**ABOUT THE AUTHOR**

❏ **James D. Peterson** is a trial attorney in the Capital Case Section, providing litigation and trial assistance and expertise to local U.S. Attorneys' Offices that are prosecuting death penalty cases. Jim has been with the Department of Justice in the Capital Case Section since 2012. Prior to joining CCS, Jim was a state prosecutor in Virginia for over eighteen years. During that time, he tried more than 130 jury trials, including multiple capital murder cases. Jim is a past recipient of the Warren Von Schuch Award for outstanding Virginia prosecutor. He has lectured throughout the country on subjects relating to computer crimes, the insanity defense, and capital case litigation, as well as mental health issues in criminal trials.

---

[26] *Id.* at 1406.
[27] *Id.*
[28] *Id.*

**EXHIBIT 6**

12:05:24 p.m.   03-20-2012   62/63

## STAFFORD COUNTY SHERIFF'S OFFICE

Upon arrival, we observed a vehicle with four males sitting in the vehicle. ne of the occupants had an obvious abrasion to his left eye and a long scratch pproximately 5 inches across his throat. He was identified as Nicholas Goss. asked him to describe the incident.

ɔss stated he was outside the house in the garage area with his friends when ʋo "black dudes" got into a verbal argument with someone and he observed one ɛ the "black dudes" kick a smaller teenager off a ledge in the driveway. He :ated at that point, we went over to help the teenager when one of the boys ɪlled out a gun and "started waving it" in his face then "shot in the air". ɛ stated his friend Carey attempted to jump in between the gunman and Goss. ɔss stated he and his friends went to leave but the black males began fighting ɪem. Goss fought with the "guy with the gun" until he pulled it out again and ɪot "four" times in the air. Goss provided a written statement.

Date: 4/16/11          Page No.: _____

STATEMENT OF: _____

I was chillin with my friends when there two black dudes came over and kicked this 16 year old off the ledge so I got up to see what happened and one of them pulled out a gun & started waving it in my pce then shot in the air. Then Casey jumped in front of me and I try to shove him out the way then we turn to leave & they run to get their "boys" So when we walked to leave they tried to start fighting us and ₵ So I fought the guy with the gun until he pulled it out again and shot 4 more times in the air. His friend from the beginning and him to started to both fight me then everyone started running. I got hit in my left eye & its swollen.

Nicholas Goss
703-362-1480
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

Nick Goss

WITNESSED BY: ~~Peter~~
Deputy JC Montgomery
#375 SCSO 4/16/11

## AFFIDAVIT

Commonwealth of Virginia

Nick Goss personally appeared before me in Stafford, VA

Betsy Sonnier this 5th day of ~~October, 2011~~ February 2012 who being
Notary

by me first duly sworn, on her/his oath to the following:

On April 16, 2011 I was at a party in Stafford and saw an individual who I now know as Antonio Curtis Covert' Navarro who was accused of assault and battery on me. Now that I (Nick Goss) have seen a picture of Antonio Curtis Covert' Navarro I swear it is not him that assaulted me. In fact I saw him that night and he wasn't even fighting. The suspect that I described as assaulting me was a tall, dark skinned, black male with a high top fade. I learned of his name by the newspaper and that is why I thought it was him that assaulted me. I was never shown his picture before, until, now. I'm sorry that the wrong man has been convicted of a crime he did not commit. This is the picture of Antonio Curtis Covert' Navarro shown to me this day.



Signed _____
Nick Goss

Address _____

_____

Phone _____

Betsy Sonnier
Notary Public
Commonwealth of Virginia
Commission #: 7226540
My Commission Expires July 31, 2012

Sworn before me, This 5th day of ~~October, 2011.~~ February 2012

Seal _____ my commission expires 7/31/12

# EXHIBIT 7

5406584031

## STAFFORD COUNTY SHERIFF'S OFFICE

_____ EVIDENCE _____

PROCESSED:        BY:                                    PHOTOS:        PRINTS:

_____ ADMINISTRATION _____

OFFICER1: FOUTS, JAMES ROBERT             #:              DATE: 04/16/11
OFFICER2:                                 #:
ROUTE   :                        ATT:     DATE:                        DIV:
CLEARANCE / :EXCEPTION:●NOT APPLICABLE
SUPERVISOR : BELTRAN, RENZO ALBERTO       #: 01003
APPROVED BY: HORTON-LARKIN, GAIL          #: 01004
ATTACHMENTS:

_____ NARRATIVE _____

I (Deputy Fouts) responded to 35 Brandy Hills Lane to assist with a disturbance
with a weapon.  Upon arrival, numerous other units were already on scene and
had several individuals detained on the driveway and were in the process of
detaining numerous others that were exiting the residence.  I took up a
position at the front o the residence and assisted with handcuffing individuals
that had just come out of the front door.  As the last were being detained by
other units, I pulled one of the females aside and asked what happened.  I
identified that individual as Ms. Shannon Jackson who told me that she was a
guest of the homeowner for an eighteenth birthday party.  She stated that there
was only supposed to be between 50 or 60 people by invitation only, but that
many more just started showing up.  She says that at one point several
individuals got into an argument outside of the house.  She did not know what
argument was about, but said that one of the individuals pulled a gun out
of his front waistband.  Shannon identified the individual with the gun as Tre
Fauntleroy.  She went on to say that Tre then fired several shots into the air
while standing in the driveway near a black SUV.  She said that he then ran
from the house toward the woods.  Shannon said that she then ran inside the
house where she remained until Sheriff's Office personnel arrived and escorted
her out of the house.  Shannon stated that she was able to positively identify
Tre as one of the shooters, and knows him by face.

5406584031                                           12:02:55 p.m.    03-20-2012        60 /63

STAFFORD COUNTY SHERIFF'S OFFICE

ind smelled of alcohol.

individuals found on scene were placed on their stomachs in the front yard
with their hands on their heads for officer safety. Being the only female on
scene, I was directed by the on-scene supervisor to pat down all the females
for weapons. During one of my pat-downs, I observed a very young female,
intoxicated to the point I had to physically hold her up during the pat-down.
I asked the female her age and she replied she was "twelve".

During my pat-downs, I observed a number of deputies interviewing the juveniles
and completing field interview paperwork. I was approached by Deputy Fouts who
indicated he had a possible witness to the incident. I went over and began
speaking to a young female, Ms. Shannon Leigh Jackson (DOB: 05/30/92). I spoke
with Ms. Jackson at the front of Deputy Fouts patrol vehicle. She provided her
address as 827 Campers Lane, Ruther Glen, VA. I asked her to describe the
incident.

She stated she was dropped off at the party by her father at around 2330 hours.
She indicated the party was very large, around 90-100 people. I asked her if
she knew the suspects involved in the incident. She replied in the affirmative,
stating she used to go to high school with a few of the suspects. She stated
specifically Kendrick (Killa) Covert, Antonio (Tone) Navarro-Covert, Geremy (G-
Ill) Tillery, Alvin (AJ) Fauntleroy, Termaine (Tre) Fletcher and a boy named
Abdul. She maintained she did not know Abdul's last name however, she believed
he was of a tall, thin stature, of Pakistani descent and whose parents owned a
local Subway restaurant. Jackson said the boys were known as the "Goon Squad".
Detective Hopkins and I, having been involved in a recent Spotsylvania
homicide involving Covert and Fauntleroy, were familiar with the suspects.
Jackson was able to bring up her Facebook account from cell phone and brought
up Covert's Facebook account because they were Facebook "friends". In Covert's
Facebook profile photo, he was standing next to Alvin Fauntleroy.

I asked her to describe the incident. She stated the boys were already at the
party when she had arrived. She was outside and noticed that behind the GMC
truck parked in the large driveway, Alvin had pulled out a gun out of his waist
band and she heard one shot fire into the air. At this point, she ran into the
house and about three minutes later, she heard another shot.

As she was running into the house, she observed Kendrick, Antonio, Alvin, and
Termaine run behind the neighbor's house. She did not observe Geremy at this
time. Jackson was asked to write a witness statement and was released.

After concluding the interview with Jackson, another female named Maryland
Rodriguez came forward and stated she believed a boy who attended Mountain View
High School named Carey Hart was involved however she could provide little
additional.

I broadcasted the BOL for Carey Hart at which point Deputy Johnson advised

PAGE 31

STAFFORD COUNTY SHERIFF'S OFFICE

Mr. Fletcher advised the DVD was supposedly a video tape recording of Shannon Jackson confessing to perjury at the May 25th preliminary hearing for Alvin Fauntleroy, Kendrick Covert and Antonio Navarro-Covert. He stated he had spoken to Sherri Navarro this morning and that she was attempting to "lift" the video off the phone which it was recorded on to a DVD. Mr. Fletcher claimed he never physically viewed the video but Sherri informed him what was on the DVD. Shannon was on the video saying the prosecutor (Jim Peterson) instructed her exactly what to say and that I specifically state "Don't forget about the marijuana", alluding to black mailing her for her testimony. On the video, allegedly both Shannon and Sherri are present.

I asked Mr. Fletcher when he became aware of this video and he stated he was informed of the DVD two weeks ago and had spoke with Sherri multiple times regarding the cases. I asked her if he spoke to Sherri prior to the court cases and he said no. Sherri also advised Mr. Fletcher that someone tried to abduct her son; that the DJ at the party fired the first gun shots; and that Spotsylvania Sheriff's Office and Fredericksburg Police Department had been "harassing" her and her family.

Mr. Fletcher maintained Sherri had not made any threats toward him. She told him this morning she was going to bring the DVD for Termaine's defense.

An attempt to obtain the DVD from Sherri was unsuccessful by Commonwealth Attorney Jim Peterson using consent, to which Sherri advised the DVD was "in my car". Commonwealth Attorney Eric Olsen and I began to draft a search warrant for Sherri's vehicle but Sherri's sister Belinda Yates provided consent to search the vehicle in the Courthouse parking lot.

I responded outside to the parking lot where the search of Belinda's Mustang was being conducted by Stafford Deputies Shannon and Hallam. I approached and advised both Sherri and Belinda the purpose of the search was to recover a DVD which Shannon Jackson admits to perjury. Sherri and Belinda maintained the only DVD they had in their possession was a DVD of the Spotsylvania Mall Fight. A search of the vehicle as well as Belinda's purse was negative for the perjury DVD.

I attempted a secondary search of the Mustang to which Sherri and Belinda inquired if they could videotape the search as well as the entire police encounter on their cell phones. I advised them they could videotape anything they wished but they decided against the videotaping. During this incident, I briefly interviewed Sherri and Belinda in the parking lot. Before any questioning, I asked Sherri and Belinda if they wanted their lawyer present however Sherri pulled me aside with Belinda and we spoke. Unlike previous encounters with Sherri, she appeared cooperative and friendly. She reintroduced herself to me and stated she had "nothing against" me and that I was just "doing my job". I told her I understood her passion for her children despite the fact I did not have any of my own. Sherri initially spoke of her

PAGE 40

## STAFFORD COUNTY SHERIFF'S OFFICE

family being targeted by the police. She specifically claimed the Spotsylvania Mall Fight video had been purposely doctored to show her children and their friends initiating the fight. She maintained the original video was longer and the first part showed the "other side" starting the fight.

I asked her about Shannon. Sherri stated Shannon had approached her son Johnny "The Peace Maker" Navarro at a party the day immediately following the May 25th preliminary hearing. She advised Johnny refused to speak with Shannon but Shannon stated she had been pressured into providing false testimony by me and Jim Peterson.

Shannon attempted multiple times to contact Sherri via phone. Shannon explained to Sherri that the testimony she provided at the preliminary hearing was false.

Shannon stated while she was "proned out" on the front yard of 35 Brandy Hills Lane with the other party-goers, I announced "Where is Shannon Jackson?" to which I promptly searched her and discovered marijuana on her person. I then threatened to charge her with possession of marijuana if she did not agree to name the Goon Squad suspects I "was after". Shannon also states that CA Jim Peterson pressured her into providing false testimony to have her testimony "mirror" the others.

Sherri stated Shannon has been hiding from me and Shannon has my cell phone number logged in her cell phone under "Cop Bitch" and that she will "never be found". She also admitted to seeing text messages I had sent Shannon and heard voicemails Fredericksburg Detective Hopkins had left requesting an immediate call back. I stressed to Sherri the importance of Shannon being present for court after she is properly subpoenaed or charges would follow. Sherri stated she was willing to "three-way" over the phone with her, me and Shannon.

I thanked Sherri and Belinda for their time and provided my phone number to Sherri if she had any additional questions.

In addition, on 28 May 2011, Sherri had conducted a jail phone call with Antonio claiming there were "new developments in the case", that Sherri was "doing their own investigation", and that "the truth will come out in court".

Follow-up will be conducted on Shannon's whereabouts as well as my initial encounter with Shannon at the 35 Brandy Hills party.

SCM/slc

PAGE 41

**EXHIBIT 8**

CR11-621

VIRGINIA:

IN THE CIRCUIT COURT OF STAFFORD COUNTY

COMMONWEALTH OF VIRGINIA

v.

ANTONIO NAVARRO-COVERT

## OPPOSITION TO MOTION FOR NEW TRIAL

COMES NOW the Attorney for the Commonwealth and hereby files its memorandum of points and authorities in opposition to the motion for a new trial, and in opposition thereto, says the following:

1.        Antonio Navarro-Covert ("defendant") was tried by a jury on November 2 and 3, 2011 and was found guilty of assault and battery, assault by mob and participating in a criminal street gang. The Grand jury of Stafford County returned indictments for the assault and battery and A&B by mob of the following listed victims "*Mr. Adams, Mr. Goss and others*." See Exhibit A.  One co-defendant, AJ Fauntleroy, pled guilty to the Stafford gang charges. Another co-defendant (and the defendant's cousin) Kendrick Covert, was tried by a jury on March 13, 2012.  He was also convicted of assault and battery, A&B by mob and participating in a criminal street gang.  The charges, and convictions, stem from a melee that occurred at a high school party attended by between 100 and 200 people.  The uncontradicted evidence established that the defendant, and his co-defendants were all members of the criminal street gang the Goon Squad, that they arrived uninvited together to a high school party, instigated fights together, and that the defendant pushed an individual off of a wall which started the fighting.

2.        Nicholas Goss was a subpoenaed witness in both cases.  Mr. Goss was

1

unavailable for the defendant's trial because he was at boot camp in another state. He testified at the trial of Kendrick Covert's trial and corroborated most of the facts of the defendant's trial. His testimony from the March 13, 2012 trial as well as Shannon Jackson's testimony is attached to the defendant's motion.

3.　　There was a discovery order in this case. Prior to trial, the Commonwealth timely provided defense counsel discovery, the production included all co-defendant statements, criminal history information concerning those Commonwealth witnesses with impeachable records, the fact that charges were nolle prossed against Tremaine Fletcher (although there was no agreement with him), some gang information about Sedrick Brown (although he was never called as a witness), and access to all trial exhibits. The Commonwealth did not provide the defense counsel with Mr. Goss' written or oral statement to law-enforcement or Shannon Jackson's statement. See Exhibit B. The defendant never requested to see any Nick Goss statements or other specific witness statements. In a separate larceny of a gun case involving this defendant scheduled during the same time period, defense counsel asked to see witness statements and they were shown to him.

4.　　At trial, the defendant introduced the statement of his co-defendant A.J. Fauntleroy. In that statement offered by the defendant, he states **"We went back to the house and Antonio asked a short, light skinned black male with an afro wearing a red shirt where they could get a beer pong table. An argument broke out when the light skinned black male made a smart comment. Antonio then used his foot and pushed the male off a ledge and a physical altercation ensued."** Exhibit C.

2

5.      At some point, the defendant's mother and his girlfriend (Carley Delbueno) contacted Mr. Goss.  Subsequently, on February 5, 2012, the defendant's mother, Sherri Covert, Herb Lux, a man pretending to be a lawyer, and a notary met Mr. Goss at Panera Bread Restaurant and handed him an affidavit to sign that they had prepared.  He signed the affidavit, although he later repudiated portions of the affaidavit during the trial of Kendrick Covert.  They also videotaped Mr. Goss.  The affidavit is attached as Exhibit D.

6.      Shannon Jackson was friends with this defendant and was a reluctant Commonwealth witness who has always consistently identified the defenadnt as being part of the melee.  Prior to trial, the defendant's mother, Sherri Covert, made contact with Shannon Jackson on several occasions.  Ms. Covert even videotaped Ms. Jackson discussing the events of the evening and provided that to counsel for her son prior to trial.  At one point after the preliminary hearing, Ms. Jackson co-habitated with the defendant's brother Johnny Navarro. See Exhibit E.  At all times, she was friendly with the defendant and his friends.

7.      The Defendant now seeks to have the Court set aside the verdict and order a new trial for the non-disclosure of Nicholas Goss' statements and the Shannon Jackson statements to law-enforcement.

### THE TESTIMONY/STATEMENTS OF NICHOLAS GOSS ARE NOT MATERIAL UNDER BRADY V. MARYLAND

8.      Any discrepancy between the Goss' statements and Shannon Jackson's trial testimony is not material to the defendant's guilt under *Brady v. Maryland* for

3

several reasons:

1.  First, the theory of the Commonwealth's prosecution was that all members of the Goon Squad were responsible for all of the crimes committed that night by members of the Goon Squad. That theory is proven by the concert of action, principal in the second degree and assault by mob jury instructions that were given to the jury as well as by the indictments that list multiple victims, including unidentified persons. See Exhibit A.

2.  Second, the defendant's own evidence (the A.J. Fauntleroy statement) showed unquestionably that the defendant himself assaulted a person at the party and started the fighting. See Exhibit C.

3.  Third, those cases dealing with *Brady* claims in the context of undisclosed statements don't find materiality when the statements are incomplete and do not exonerate the defendant, but rather are simply inconsistent with some of the evidence adduced at trial.

4.  Finally, Shannon Jackson's testimony aside, the totality of the evidence adduced at trial was sufficient to sustain the defendant's conviction.

9.  The suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution. *Brady v. Maryland*, 373 U.S. 83, 87 (1963); *Taylor v. Commonwealth*, 41 Va. App. 429, 432, 585 S.E.2d 839, ___ (2003). More specifically, the Supreme Court has held:

> Although the constitutional duty is triggered by the potential impact of favorable but undisclosed evidence, a showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted unlimitedly in the defendant's acquittal (whether based on the presence of reasonable doubt or acceptance of an explanation for the crime that does not inculpate the defendant). *Bagley*'s touchstone of materiality is a "reasonable probability" of a different result, and the adjective is important. The question is not whether the defendant would more likely than not have received a different verdict with the evidence, ***but whether in its absence he received a fair trial, understood as a trial resulting in a verdict [worthy] of confidence. A "reasonable probability" of a different result is accordingly shown when the***

4

> *government's evidentiary suppression "undermines confidence in the outcome of the trial."*

*Kyles v. Whitley*, 514 U.S. 419, 434 (1995). More specifically, "the standard of materiality required to set aside a criminal conviction on *Brady* grounds varies with the specificity of the defendant's request and the conduct of the prosecutor." *United States v. Buchanan*, 891 F.2d 1436 (10th Cir. 1989); *United States v. McElhiney*, 275 F.3d 928 (10th Cir. 2001). If the defendant makes a request for specific evidence and the prosecutor fails to disclose responsive evidence, then the evidence is material if it might have affected the outcome of trial. *United States v. McElhiney*, 275 F.3d 928 (10th Cir. 2001). If the defendant, however, either makes no request for evidence or simply makes a general request (e.g., asking for "all *Brady* material or "anything exculpatory"), then the evidence is material *only if* it creates "a reasonable doubt that did not otherwise exist." *Id.*

10. The inculpatory statement of the co-defendant A.J. Fauntleroy introduced by the defendant is alone fatal to his materiality claim. In that statement, offered by the defendant, the co-defendant states:

> We went back to the house and ***Antonio asked a short, light skinned black male with an afro wearing a red shirt where they could get a beer pong table. An argument broke out when the light skinned black male made a smart comment. Antonio then used his foot and pushed the male off a ledge and a physical altercation ensued.***

See Exhibit C. That statement, consistent with the Commonwealth's evidence of the defendant's guilt, directly implicates the defendant and proves his criminal culpability. Moreover, that evidence introduced by the defendant is entirely consistent with the Commonwealth's evidence of the defendant's guilt. This evidence was buttressed by

5

testimony of Shannon Jackson which directly implicated the defendant in starting the fight and participating in the gang activity. Transcript of trial, November 3, 2011, pgs. 5-22. Tremaine Fletcher, the defendant's friend and criminal associate also directly implicated the defendant in the instigation and participation in the fighting and gang activity. Transcript of trial, November 2, 2011 pgs. 182-264. Tremaine Fletcher testified at one point "they were like arguing I guess. And when I looked over, he like just pushed him off the edge." Transcript of trial, November 2, 2011 at 200. He went on to explain that by the people in the dispute he meant "AJ and Tone." Id. "Tone" is of course Antonio Navarro-Covert. Tremaine Fletcher also identified all of the participants on a photo and shows that the defendant was mixed up with all of the other gang members. See Exhibit F. Importantly, when the defendant's cousin and co-defendant testified in his own behalf several months later, he also places the defendant in the same place. See Trial Exhibit, March 13, 2012, attached as Exhibit G. In fact, the evidence presented by the defendant himself (Fauntleroy statement), Tremaine Fletcher's testimony as well as the gang testimony was sufficient to sustain the defendant's conviction.

### THE GOSS STATEMENTS ARE NOT INCONSISTENT WITH THE DEFENDANT'S GUILT

11. Perhaps most importantly, the Goss statements to law-enforcement are not inconsistent with the defendant's guilt. The defendant was charged with, and convicted of, gang participation, assault and battery and assault and battery by mob. The incident that brings the defendant to court was a melee at a party with between 100-200 people

6

present. A melee is defined as "a confused hand to hand fight or struggle among several people." It is important to note that the nature of the crime and the circumstances surrounding its commission inevitably results in a trial and testimony in which numerous witnesses observe portions of an incident from different perspectives. There were inconsistencies within the evidence presented by the Commonwealth as well as the that presented by the defense. For example, the AJ Fauntleroy statement states that "An argument broke out when the *light skinned black male* made a smart comment. Antonio then used his foot and pushed the male off a ledge and a physical altercation ensued." Shannon Jackson testified that Nick Goss was white. That in no way diminishes the probative value of Faultleroy's statement that the defendant engaged in assaultive behavior that started the brawl. It is understandable that there is some discrepancy between the witness accounts. Defense counsel himself argued to the jury that:

> Antoine White said he came out and he described it as a big brawl. Multiple people up and down the driveway fighting, multiple groups, boys, girls fighting, everybody was fighting. When asked did you see who hit who and who did you hit, he couldn't remember who hit him. He couldn't remember, Jesse Adams, when asked who hit you, he couldn't identify who hit him. He doesn't know whether it was my client. He doesn't know whether it was my client's friend. He doesn't know if it was Nick Goss. He didn't know who hit him. **It was that kind of altercation.**

Transcript of Trial, November 3, 2011, pg. 198. The consistent evidence through all of the testimony, including the defendant's own evidence, is that the defendant was present in close proximity with his fellow gang members and that he was participating in the affray. It is also significant, and conclusive the Commonwealth suggests, that Nicholas Goss subsequently testified that the people he was exchanging blows with were AJ Fauntleroy and Kendrick Covert, people standing right next to the defendant and his

7

fellow gang members. The jury was fully instructed on accessory liability as well as concert of action liability. Specifically, the were instructed that:

> If there is a concert of action with the resulting crime one of its incidental probable consequences, then whether such crime was originally contemplated or not, all who participate in any way in bringing it about are equally answerable and bound by the acts of every other person connected with the consummation of such resulting crime.

Moreover, the law as it relates to mob violence is that any collection of people, assembled for the purpose and with the intention of committing an assault or a battery upon any person or an act of violence, without authority of law, shall be deemed a 'mob.' _Johnson v. Commonwealth_, 58 Va. App. ___ 2091101, ___ S.E.2d ___ (2011). Every person composing a mob becomes criminally culpable even though the member may not have actively encouraged, aided, or countenanced the act. **In other words, the statute imposes individual liability based on collective act and intent**. _Johnson v. Commonwealth_, 58 Va. App. ___ 2091101, ___ S.E.2d ___ (2011).

12. It is also significant that both Shannon Jackson and AJ Fauntleroy knew the defendants and the Goon Squad members. Both Shannon Jackson and AJ Fauntleroy identified the defendant, a man who was a friend and fellow gang member, respectively, as the person who pushed someone off the ledge. They were both at a vantage point to see the events unfold when the defendant pushed the individual off of the wall and the fighting started. Nicholas Goss did not know any of the gang members and was confronted with the situation he neither expected nor anticipated. Nicholas Goss identifies both AJ Fauntleroy and Kendrick Covert as the individuals he was fighting with for the first time at trial one year after the incident. Transcript of trial, March 13, 2012

8

163. The Commonwealth never argued that this defendant was exchanging blows with Nicholas Goss. All of the testimony proved that the defendant was in close proximity to his fellow Goon Squad members when the fighting took place. Tremaine Fletcher, AJ Fauntleroy, Shannon Jackson, Kendrick Covert, and even the defendant's girlfriend Carley Delbueno place the defendant in close proximity to the fighting. The fact that Nicholas Goss does not see the defendant push an individual does not negate his guilt at all. Rather, the Goss statement is simply a reflection of the realities of the crime: a chaotic incident in which multiple individuals (AJ Fauntleroy, Kendrick Covert, Antonio Navarro Covert, Tremeaine Fletcher and others) created a melee and were fighting with multiple individuals (Nicholas Goss, Antoine White, Jesse Adams and others).

13. The Goss statement appears somewhat inconsistent with aspects of Shannon Jackson's testimony and the written statement of A.J. Fauntleroy offered by the defendant himself. The Goss statement is not, however, inconsistent with the defendant's guilt. Defendant now also claims the Shannon Jackson initial statement is exculpatory. The Commonwealth contends that there is nothing exculpatory about the statement. She was simply responding to questions about the shooting and was not asked anything about a pushing incident at a wall. In fact, it was Shannon Jackson who identified the defendant as being involved in the altercation and that was in the initial statement. When cross examined by defense counsel in the Kendrick Covert trial, Ms. Jackson testified "They just asked me a picture of who had the gun and that was AJ." Transcript of trial, March 13, 2012, pg. 249. Considering the totality of the evidence, there is ample evidence of the defendant's guilt and the Goss and Jackson statements do not change that analysis.

9

## THE GOSS AFFIDAVIT IS TAINTED AND NOT MATERIAL

14.    The Goss affidavit is tainted and is not material under *Brady v. Maryland*.

Simply put, the history behind the procurement of the affidavit is bizarre. The history

behind the defendant's mother and Herb Lux's involvement in this case is also bizarre

and disturbing. In short, Sherri Covert, Carly Delbueno and Herb Lux set out to author a

document with the purpose of not finding the truth, but, rather to create an appealable

issue. Herb Lux is not an attorney, but holds himself out as an attorney. He is a multiple

convicted felon who has entered his appearance as an attorney in all of the Goon Squad

cases (five cases) and has filed pleadings on behalf of his "clients." See Exhibit H. He

has pending criminal charges in Spotsylvania for intimidating a jury forewoman in his

son's criminal case as well as in Stafford County for practicing law without a license and

obstruction of justice. See Exhibit I. He has civilly sued Deputy Commonwealth's

attorney Jim Peterson, Commonwealth's Attorney William Neely from Spotsylvania,

former Commonwealth's Attorney Daniel M. Chichester, the entire Spotsylvania County

Board of Supervisors, the entire Stafford Board of Supervisors, the victim in his pending

Spotsylvania case who is also the jury forewoman of his son's case, that woman's

attorney who represents her, Circuit Court Judge D.W. Murphy and others. See Exhibit I.

Sherri Covert has been equally prolific when advocating on behalf of her son. She has

shown up at the scene of a traffic stop involving her son and nephew and attempted to

intimidate police, shown up a crime scenes involving the shooting of a young child to tell

witnesses not to cooperate with law-enforcement, shown up at the work place of a victim

of malicious wounding to encourage her not to testify, tape recorded Shannon Jackson

allegedly confessing to perjury at the preliminary hearing of her son in this case, as well as other instances of misconduct.  See Exhibit J.  Moreover, in Court under oath Mr. Goss repudiated portions of his affidavit.

### VIRGINIA COURTS HAVE ADDRESSED THESE ISSUES

15.     Several Virginia courts have addressed similar issues and have uniformly held that (1) the statements at issue were not exculpatory under a _Brady_ analysis and/or (2) were not material under a _Brady_ analysis.

16.     First, in _Lovitt v. Warden,_ 266 Va. 216, 216, 585 S.E.2d 801, ___ (2003), the Supreme Court of Virginia held that neither the failure of the prosecution to disclose allegedly exculpatory information to defense counsel before trial, nor destruction of evidence after the trial, provided any valid basis for habeas corpus.  In that case, the defendant's counsel procured an affidavit impeaching a main witnesses trial testimony. At the habeas hearing, the court considered an affidavit handwritten by the defendant's habeas counsel and signed by a material witness after the trial. The affidavit, which was prepared after the defendant's trial, contained several statements that conflicted with his trial testimony. For example, in the affidavit, Lucas stated that he initially informed the prosecutors that Lovitt had stated he used a gun to shoot Dicks, that Lovitt had discarded the weapon in a drain, and that Warren Grant had driven Lovitt from the pool hall to Grant's house. These statements contradicted the witnesses trial testimony that Lovitt stated he used a knife or other object to stab Dicks, and that he discarded the weapon while walking from the pool hall to Grant's house. _Lovitt v. Warden,_ 266 Va. 216, 236,

11

585 S.E.2d 801, ___ (2003).

17. At the hearing in the *Lovitt v. Warden* case, the witness largely repudiated the affidavit. The witness testified that the inconsistent statements contained in the affidavit were not accurate and that his testimony during Lovitt's trial was truthful. He stated that on the day he signed the affidavit, he was "confused" after answering "three hours' worth of questions" posed by Lovitt's habeas counsel. Lucas also stated that he did not feel "too good" that day because he had undergone a tooth extraction and was waiting to receive some medication. Lucas further testified that he did not thoroughly read the affidavit, but merely "glimpsed through it" and "glanced over it," not paying attention to its content. He also testified that he was mistaken when he had stated that he received a sentence reduction in exchange for his cooperation in the Young case. *Lovitt v. Warden,* 266 Va. 216, 237, 585 S.E.2d 801, ___ (2003). The Court found no *Brady* violation and held:

> This due process analysis requires consideration on an item-by-item basis whether the evidence at issue was exculpatory. *Kyles*, 514 U.S. at 436 n.10; *United States v. Ellis*, 121 F.3d 908, 916 (4th Cir. 1997). However, the determination whether undisclosed exculpatory evidence was material must be made by considering its cumulative effect. *Kyles*, 514 U.S. at 436 n.10; *Monroe v. Angelone*, 323 F.3d 286, 302 (4th Cir. 2003); *Ellis*, 121 F.3d at 916

> \* \* \*

> The circuit court found that Lucas did not make the inconsistent statements to the police detailed in the affidavit. This factual finding is supported by Lucas' testimony that he did not read the entire affidavit prepared by habeas counsel before signing it, and that he did not agree with its contents. The circuit court's factual finding also is supported by Margaret Eastman's testimony that Lucas' statements before trial were consistent with those Lovitt gave to the police when he was arrested.

12

> Because the circuit court's finding is supported by the evidence, we conclude that Lovitt has not demonstrated that the Commonwealth failed to provide exculpatory evidence regarding statements Lucas made prior to trial.
>
> We conclude our *Brady* inquiry by examining the effect of the one item of exculpatory evidence that the Commonwealth failed to disclose to Lovitt's trial counsel, namely, the fact that Lucas had received a benefit for his cooperation with the police in the Evans case. We conclude that the failure to disclose this evidence did not place Lovitt's trial in a posture that would undermine confidence in the verdict. *See Strickler*, 527 U.S. at 290; *Kyles*, 514 U.S. at 435.

*Lovitt v. Warden,* 266 Va. 216, 247, 585 S.E.2d 801, ___ (2003).

18.    The Court of Appeals also considered a motion for new trial based upon a *Brady* claim in *Taylor v. Commonwealth,* 41 Va. App. 429, 431, 585 S.E.2d 839, ___ (2003). In that case, the defendant argued that the undisclosed investigatory notes of the two detectives who interviewed witnesses at the crime scene contained accounts that were exculpatory and inconsistent with the witnesses' trial testimony. Specifically, the defendant claimed that several of the witnesses' accounts did not mention that the defendant was "out there shooting at the scene of the crime" and that the failure to mention the defendant as one of the shooters was inconsistent with their testimony. In upholding the trial court's denial of the *Brady* claim, the Court held:

> The testimony of Detectives McTernan and Thompson concerning the witnesses' pretrial statements did not identify inconsistent or contradictory statements that could have been used to impeach a particular witness. The investigatory notes, to the effect that "they" were shooting, or that "they" got out of their cars and started shooting, or which specifically identified Nash, but did not specifically mention Taylor by name, are not inconsistent with the witnesses' trial testimony. Moreover, to the extent that the detectives' notes would support a claim that the witnesses identified only Nash and did not mention Taylor, we do not believe that on this record the disclosure would have materially affected the outcome of the case. Therefore, the trial court did not err in concluding that the

13

Commonwealth did not withhold exculpatory evidence from the accused.

*Taylor v. Commonwealth*, 41 Va. App. 429, 434, 585 S.E.2d 839, ___ (2003).

19.     Other cases discussing *Brady* claims in the context of a motion for new trial based upon the non-disclosure of evidence include: *Bly v. Commonwealth*, 55 Va. App. 1, 3, 682 S.E.2d 556, ___ (2009)(motion properly denied where government failed to disclose prior times that confidential informant lied to police about drug sale); *Coley v. Commonwealth*, 55 Va. App. 624, 629-630, 688 S.E.2d 288, ___ (2010)(motion for new trial properly denied despite claim that 1) that police recovered a document from motel bearing the name of someone other than defendant; 2) that the officers testified differently as to the location of the indentation on appellant's face; 3) that witness was aware of defendant's tattoo prior to the encounter, but did not observe the tattoo from a distance of less than 13 feet; 4) that neither officer knew who wrote the police report and that the report did not mention any indentation on the driver's face; and 5) that witness had previously testified that the Explorer struck the police vehicle a second time on 95 south, causing more damage than the first impact); *Hemphill v. Commonwealth*, 09 Vap UNP 1363084 (2009)(motion properly denied where government failed to disclose .00 bac reading where trial court found defendant guilty stating "that witnesses had testified to "a strong odor of alcohol" coming from appellant and that appellant's drinking had played a role in the incident"); *Frontanilla v. Commonwealth*, 38 Va. App. 220, 225, 562 S.E.2d 706, ___ (2002)(motion properly denied despite fact that government did not disclosed that multiple officers present at scene in spite of officer's claim that she was only officer and claim that officers could both dispel the identification of the defendant by testifying

14

Case 2:23-mc-00001-JRS-MG    Document 5-3    Filed 12/13/23    Page 72 of 82 PageID #:
108
Case 4:13-cr-00363    Document 171-8    Filed on 03/05/20 in TXSD    Page 16 of 16

officer as well as be used for impeachment of said officer); *Lee v. Commonwealth*, 09
Vap UNP 0211082 (2009)(undisclosed fact that Commonwealth paid witneses rent for
two months not material); *Rashad v. Commonwealth*, 00 Vap UNP 1697992
(2000)(failure to disclose witnesses pre-trial inability to identify perpetrator of robbery
not material where defendant was guilty under accessory liability theory).

20.     In this case, the evidence and information the defendant relies upon should
not be the basis for a new trial because the evidence in no way casts doubt upon the
defendant's guilt and because the defendant himself introduced evidence that
affirmatively proves the point of which he complains, it being uncontested at trial that the
defendant pushed a person off of a wall and instigated the fighting.  Defendant cannot be
heard to complain that information or evidence was *Brady* material when the issue at the
heart of his complaint was uncontested and agreed upon by both parties.

WHEREFORE, based upon the facts and evidence in the case and applicable law,
the Attorney for the Commonwealth respectfully requests that the Court deny the motion
to set aside the verdict.

_____
Attorney for the Commonwealth

James D. Peterson
Assistant Commonwealth's Attorney
P.O. Box 66
Stafford, VA 22555
(540) 658-8780

CERTIFICATE OF SERVICE

I hereby certify that the foregoing opposition was delivered by fax this 30th day of
March, 2012 to James Ilijevich, 510 Princess Anne Street, Suite 101, Fredericksburg, VA
22401.

_____
Attorney for the Commonwealth

15

# EXHIBIT 9

| From: | Khandelwal, Sharad (USATXS) |
|---|---|
| To: | Nelson, Melody (USATXS) |
| Subject: | FW: United States v. James Wayne Ham - SDTX - Competency examination |
| Date: | Tuesday, February 26, 2019 3:15:58 PM |

Melody can you scan and bates for production?

 SHARAD S. KHANDELWAL, DEPUTY CRIMINAL CHIEF
U.S. Attorney's Office, S.D. Tx, Human Rights & Organized Crime Section
Tel: (713) 567-9345   Cell: (832) 444-7577

**From:** Peterson, James D (CRM) <James.D.Peterson@usdoj.gov>
**Sent:** Wednesday, February 20, 2019 3:22 PM
**To:** Khandelwal, Sharad (USATXS) <SKhandelwal@usa.doj.gov>; Stotts, Jill (USATXS) <JStotts@usa.doj.gov>; Nelson, Melody (USATXS) <MNelson3@usa.doj.gov>
**Subject:** FW: United States v. James Wayne Ham - SDTX - Competency examination

Here is a copy of the December 16, 2015 e-mail.

I do not know if it is "discoverable," but do not have any issue with the contents.

Take care,

Jim

**From:** Peterson, James D
**Sent:** Wednesday, December 16, 2015 4:35 PM
**To:** Reardon, Maureen (BOP) (Maureen.Reardon@usdoj.gov) <Maureen.Reardon@usdoj.gov>
**Cc:** Khandelwal, Sharad (USATXS) <Sharad.Khandelwal@usdoj.gov>; Elmilady, Suzanne (USATXS) <Suzanne.Elmilady@usdoj.gov>
**Subject:** United States v. James Wayne Ham - SDTX - Competency examination

Dear Dr. Reardon:

I was told that you have been assigned to handle the James Wayne Ham competency evaluation.  Is that correct?

I was in Butner last week preparing for trial in another case and hand delivered the Ham competency materials to Dr. Gillespie Wadsworth to give to you.

Did you receive the materials?

Did you receive the defense materials?  They have shared their submission materials with us and I

H13-363-A-06747

can forward them to you as well.

On a related note, I feel that it would be helpful to review the non-privileged jail calls by inmate Ham to friends, family members and others.

Do you have access to those materials?

We have not reviewed the calls to date, but can make arrangements to forward them to you if you would like.

Please call me at your earliest convenience to discuss the examination.

Thank you for your time.

Take care,

Jim

James D. Peterson
Trial Attorney
Capital Case Section
United States Department of Justice
1331 F Street N.W.
6th Floor
Washington, D.C. 20530
(202) 353-0796
James.d.peterson@usdoj.gov

H13-363-A-06748

| From: | Khandelwal, Sharad (USATXS) |
|---|---|
| To: | Nelson, Melody (USATXS) |
| Subject: | FW: United States v. James Wayne Ham - SDTX - Competency examination |
| Date: | Tuesday, February 26, 2019 3:16:17 PM |

Same with this.



SHARAD S. KHANDELWAL, DEPUTY CRIMINAL CHIEF
U.S. Attorney's Office, S.D. Tx, Human Rights & Organized Crime Section
Tel: (713) 567-9345    Cell: (832) 444-7577

**From:** Peterson, James D (CRM) <James.D.Peterson@usdoj.gov>
**Sent:** Wednesday, February 20, 2019 3:23 PM
**To:** Khandelwal, Sharad (USATXS) <SKhandelwal@usa.doj.gov>; Stotts, Jill (USATXS) <JStotts@usa.doj.gov>; Nelson, Melody (USATXS) <MNelson3@usa.doj.gov>
**Subject:** FW: United States v. James Wayne Ham - SDTX - Competency examination

**From:** Peterson, James D
**Sent:** Thursday, December 17, 2015 9:33 AM
**To:** Khandelwal, Sharad (USATXS) <Sharad.Khandelwal@usdoj.gov>; Elmilady, Suzanne (USATXS) <Suzanne.Elmilady@usdoj.gov>
**Subject:** FW: United States v. James Wayne Ham - SDTX - Competency examination

FYI

**From:** Maureen Reardon [mailto:mreardon@bop.gov]
**Sent:** Thursday, December 17, 2015 8:18 AM
**To:** Peterson, James D <James.D.Peterson@CRM.USDOJ.GOV>
**Subject:** Re: United States v. James Wayne Ham - SDTX - Competency examination

Dear Mr. Peterson,

Yes, I have been assigned to evaluate Mr. Ham, and will consult with neuropsychologist, Dr. Tracy Pennuto. I did receive a CD-ROM containing many documents but am unsure if this included the "defense materials" you reference. I contacted defense counsel yesterday via e-mail, but if you have ready access to those materials, by all means forward them. I am open to reviewing the non-privileged jail calls as well, and will look into how I may access that from FDC-Houston. Let me know a good time to reach you by telephone. I am in today, tomorrow, and Tuesday/Wednesday next week. I'm also in the 28, 29, and 30th the following week.

Sincerely,

Maureen L. Reardon, PhD, ABPP
Deputy Chief Psychologist

H13-363-A-06749

Federal Medical Center
Old Oxford Highway 75
Butner, NC 27509
(919) 575-3900, ext. 5294

*** NOTE ***
The information contained in this transmission is intended only for the individual or organization named above and may contain confidential or privileged information. If you are not the intended recipient, any dissemination, distribution, or copying of this communication is prohibited. If you received this information in error, please notify the sender immediately.

>>> "Peterson, James D" <James.D.Peterson@usdoj.gov> 12/16/2015 4:35 PM >>>
Dear Dr. Reardon:

I was told that you have been assigned to handle the James Wayne Ham competency evaluation. Is that correct?

I was in Butner last week preparing for trial in another case and hand delivered the Ham competency materials to Dr. Gillespie Wadsworth to give to you.

Did you receive the materials?

Did you receive the defense materials? They have shared their submission materials with us and I can forward them to you as well.

On a related note, I feel that it would be helpful to review the non-privileged jail calls by inmate Ham to friends, family members and others.

Do you have access to those materials?

We have not reviewed the calls to date, but can make arrangements to forward them to you if you would like.

Please call me at your earliest convenience to discuss the examination.

Thank you for your time.

Take care,

Jim

James D. Peterson
Trial Attorney
Capital Case Section
United States Department of Justice
1331 F Street N.W.
6th Floor

H13-363-A-06750

Washington, D.C. 20530
(202) 353-0796
James.d.peterson@usdoj.gov

H13-363-A-06751

# EXHIBIT 10

★Chron https://www.chron.com/news/houston-texas/houston/article/Houston-judge-questions-capability-of-federal-14021645.php

# Houston judge questions capability of federal prosecutor in San Jacinto County death penalty case

By **Gabrielle Banks**  Published 8:08 pm CDT, Wednesday, June 19, 2019



**IMAGE 1 OF 3**

James Wayne Ham, 36, was found around midnight by the Texas Rangers and Postal Inspectors. He is considered a person of interest in the death of Marie Youngblood, a postal worker who was found murdered in her
... more

A federal judge publicly rebuked a Justice Department prosecutor in a Houston death penalty case over allegations the Washington, D.C., lawyer hid exculpatory evidence in another capital case in Indiana federal court.

U.S. District Judge Lynn N. Hughes, who is known to air his feelings candidly about government employees and policies, made his opinion of Assistant U.S. Attorney James D. Peterson clear Wednesday during a discovery hearing.

"I think that America could find a better representative of its values and ideals than Mr. Peterson," Hughes told another prosecutor on the case. It was the second time in the past year the judge has clashed in court with Peterson.

The judge's admonition came during a hearing for James Wayne Ham, of San Jacinto County, who **faces a capital trial** on charges that in 2013 he fatally shot Eddie "Marie" Youngblood, a 52-year-old Coldspring postal worker and then burned her remains.

D031020

**Recommended Video**                                                                          X

Your California Privacy Rights     Interest Based Ads

Privacy Notice     Advertising     Terms of Use     Contact Us



POWERED BY CONCERT                                                                    FEEDBACK

Ham's defense lawyers say that amid a dysfunctional culture in their unit, Peterson and two other Justice Department lawyersdemonstrated a pattern of misconduct in other death penalty cases around the country that warrants further scrutiny of their work regarding Ham. If the judge orders the release of additional documents, the defense team will assess whether they believe evidence that weighs in favor of Ham's innocence was withheld.

**RELATED:** Justice Department still seeking death penalty in 2013 slaying of San Jacinto County mail carrier

The lead defense lawyer in the Houston case, Kimberly C. Stevens, also noted that Peterson's Texas Bar license has been suspended since 1996 for failure to pay his dues. She told the judge that becoming ineligible due to an administrative suspension constitutes a violation of the federal and local rules. Peterson has an active law license in Virginia and could appear in federal court without a Texas license, according to the state bar association.

Evidence presented in a civil suit in Connecticut that Peterson and Steve Mellin, another prosecutor previously tied to the Ham case, had destroyed or failed to produce evidence favorable to the defense in other federal death penalty cases. And a declaration by Amanda Haines, a former co-worker, in an Indiana death penalty case stated that she had resigned due to ethical breaches she had reported that were never addressed by management.

Haines, the aggrieved ex-prosecutor, said in a sworn statement that Peterson "committed a fundamental error in judgment" and a violated protocol in the Indiana case when he interviewed dozens of witnesses who had evidence favorable to the defendant without law enforcement present.

Peterson then compounded the error, in her view, by destroying his notes and then denying he had disposed of them. Haines said that attorney Mellin, who worked on the Ham case in Houston from 2013 to 2014, had missed deadlines and failed to review documents or identify exculpatory Brady material boxes of evidence in the Indiana case.

Justice lawyers said under oath that Peterson's department was riddled with personnel problems, including allegations of a sexualized environment at the office that was both hostile to and discriminatory against women. Male lawyers accused of

D031021

failing to cover the basics won awards and got plum assignments, like the Boston Marathon bombing case, while femal

Your California Privacy Rights    Interest Based Ads

Privacy Notice    Advertising    Terms of Use    Contact Us

at Ham's death penalty determination hearing in Washington opposite two female defense lawyers. These top capital prosecution officials subsequently faced scrutiny and were ousted from their roles in the wake of allegations of misconduct and disparate treatment.

Hughes, the judge in the Houston case, ordered the prosecutors to produce a list of all events and documents involving Peterson and the other Justice lawyers. The judge said he would hold off on ruling on the defense's request for new evidence until he reviews these lawyers involvement in the investigative process and trial preparation.

Peterson, seated with fellow counsel, looked flushed and shook his head. He never addressed the judge nor did he look up from the table during the scolding. Peterson's supervisor, the acting chief of the Capital Case Section in Washington, sat in front of the courtroom gallery witnessing the discussion about his staffer.

Ham sat at the end of the defense table in olive green uniform of the federal detention center downtown. A family member and friend were the only members of the public watching the hearing.

Hughes, who is 77, has drawn the spotlight on a number of occasions since his 1985 appointment to the bench by President Ronald Reagan. While some lawyers familiar with the judge's temperament are quick to defend him, Hughes has a reputation for tossing out off-the cuff comments that recipients perceive as denigrating to women and people of color. He also publicly castigates lawyers for improper attire and poor decorum. He famously issued an "order of ineptitude" to a D.C. lawyer who showed up in his courtroom in a track suit after an international flight.

The judge last clashed with Petersonin October when the team of Houston and Washington prosecutors declined to accept a guilty plea from Ham. The 42-year-old defendant had offered to forgo a murder trial in exchange for a sentence of life prison without parole.

The judge asked Peterson at that hearing the benefit of spending $600,000 to $800,000 of taxpayers' money to have a defendant potentially wait for years on end to be executed. Peterson and another lawyer told Hughes the decision to pursue the death penalty was made by former Attorney General Eric Holder.

Hughes complained about Peterson's "very long bureaucratic answer" to his question.

Prosecutors said Wednesday that the rationale for seeking the death penalty is due in part to Ham's lack of remorse.

On Wednesday, the judge considered the sworn statements from other jurisdictions indicating Peterson and Mellin had withheld evidence. After defense lawyers in Terre Haute submitted allegations of so-called Brady violations involving their client earlier this year, the federal prosecutors agreed to accept a guilty plea and closed the case.

*gabrielle.banks@chron.com*

© 2019 Hearst Communications, Inc.

**H E A R S T**

D031022