**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION**

IN RE:   CHARLES HALL    )
             )
             ) 2:23-MC-00001-JRS-MG
             )
             )
             )

**UNITED STATES OF AMERICA'S RESPONSE TO CHARLES HALL'S MOTION TO
UNSEAL ALL DEPOSITIONS IN *UNITED STATES V. ROGERS*
AND ANDREW ROGERS' MOTION TO UNSEAL ALL DEPOSITIONS**

The United States of America, by counsel, respectfully submits its response to intervenor Charles Hall's Motion to Unseal All Depositions in *United States v. Rogers* and supporting memorandum [Doc. Nos. 1 & 2] and Andrew Rogers' Joinder In Charles Hall's Motion to Unseal All Depositions and Motion to Unseal All Depositions [Doc. 5].

Hall's claim is constitutionally and factually inapt. Hall, a prisoner in the Western District of Missouri, seeks discovery in this Court, in a long-closed matter, preliminary to his prospective filing of a 28 U.S.C. § 2255 motion. In doing so, Hall observes that one of the attorneys who prosecuted him, James Peterson, was accused of misconduct during the litigation of the capital case against Andrew Rogers—which occurred several years after Hall's prosecution. Hall theorizes that this coincidence could provide the basis for a claim of relief in his unfiled § 2255 action. Thus, he requests that this Court aid in his speculative search for colorable claims by unsealing all depositions in this case related to allegations of misconduct against Mr. Peterson. In support of Hall's position, Rogers, whose case has been concluded for nearly five years, filed a document joining in the motion and requesting unsealing. Doc. No. 5.

The Court should deny the motions to unseal. Hall lacks Article III standing to intervene, has no right to intervene in a closed matter, cannot claim a public right of access by proxy (he actually desires the materials for his own litigation purposes, not for the public), and cannot meet the standard to unseal documents. Beyond that, Hall has not met the standard to obtain discovery in a § 2255 motion—a question which, in all events, should be addressed in the first instance by the Western District of Missouri.

## BACKGROUND

As noted, Charles Hall's case derives from another district court. In July of 2014, Hall was convicted of murder and sentenced to death by a jury in the Western District of Missouri. His conviction and sentence were upheld on direct appeal, and the Supreme Court denied certiorari from that judgment.

Hall is now preparing a motion to vacate that sentence under 28 U.S.C. § 2255. He and the government have agreed to a February 9, 2024, deadline for the filing of the § 2255 motion in the Western District of Missouri. *United States v. Hall*, 4:21-cv-08001-BCW, ECF Doc. No. 54 (W.D. Mo. June 26, 2023).

In evident preparation for his unfiled § 2255 motion, Hall requests that this Court unseal documents in another criminal case. Because Hall's claims rest on facts pertaining to Andrew Rogers' case, some background into Rogers is necessary here:

On July 25, 2013, Andrew Rogers entered the custody of the Bureau of Prisons ("BOP") and was confined to the U.S. Penitentiary at Terre Haute ("USP-TH"). On September 9, 2013, he was assigned to the prison's Security Housing Unit ("SHU"). In the early morning hours of December 26, 2013, a correctional officer performing rounds in the SHU observed Rogers, one of the two occupants of cell B-223, standing just inside the door. Rogers told the officer to "[g]et

2

this dead motherfucker out of my cell," referring to the body of Thomas Sim, the other inmate assigned to cell B-223. Sim's body lay motionless in a pool of blood on the cell floor. Sim's hands were tied behind his back to the frame of the cell's bunkbed. Emergency personnel responded and pronounced Sim dead.

Rogers was escorted to a holding area while officials processed his cell for evidence. In the holding area, Rogers told the warden he would "kill anyone you put in the cell with me" and that he would "keep killing until I force you guys to give me the death penalty. . . . I'm not going to do the rest of my time in a bathroom with another inmate." Later that day, Rogers waived his constitutional rights and submitted to an interview with an FBI special agent. In that interview, he admitted to killing Sim and reiterated his explanation that he wanted to be given the death penalty. He also told the agent he planned the killing for weeks, having used nail clippers to fashion a weapon from his metal bunkbed. A few months after the homicide, Rogers participated in another interview in which he identified a photograph of the murder weapon recovered from his cell, stating, "That's my shank" and "I stabbed my cellie to death with it." In a letter to his father written about 10 days after the murder, Rogers claimed to have killed Sim because he "refuse[d] to live with another man in a 8' x 12' 'bathroom' for 27 years." Rogers was charged by indictment with first-degree murder, in violation of 18 U.S.C. § 1111 in May of 2016.

Because Rogers was charged with death-eligible offense, his case was subject to the capital case review process outlined in Title 9, Chapter 9-10.000 of the *United States Attorney's Manual*, subsequently retitled the *Justice Manual*. *See* https://www.justice.gov/jm/jm-9-10000-capital-crimes. As then prescribed, the Protocol was facilitated by the Justice Department's Capital Case Section and culminated in the Attorney General's decision to seek, or not to seek,

the death penalty.[1] To commence the review process, the prosecuting U.S. Attorney in the *Rogers* case provided CCS with a written memorandum, summarizing the facts and evidence of the crime, the backgrounds and criminal records of the defendant and victim, the views of the victim's family on seeking the death penalty, and a recommendation whether to pursue capital punishment.  U.S.A.M. § 9-10.080.  The memo also discussed applicable intent and sentencing factors under 18 U.S.C. §§ 3591 and 3592.  *Id*.  CCS distributed the memorandum to a Capital Case Review Committee ("the Committee"), which was composed of attorneys from the Office of the Deputy Attorney General ("ODAG"), the Office of the Assistant Attorney General for the Criminal Division ("OAAG"), and prosecutors from other Department components.  U.S.A.M. § 9-10.130.

In some instances, the Protocol afforded defense counsel an opportunity to meet with the Committee and present evidence and argument in mitigation.  U.S.A.M. § 9-10.130.  Such meetings were chaired by the Chief of CCS, or his designee, and attended by representatives of the prosecuting U.S. Attorney's Office.  *Id*.  After considering all the information presented to it, the Committee forwarded a memo to the Attorney General recommending whether to seek the death penalty.  *Id*.  The Attorney General issued the final decision by letter.  *Id*.  The documents generated during the review process were not subject to discovery by the defendant or his counsel.  U.S.A.M. § 9-10.080; *see also* Fed. R. Crim. P. 16(a)(2) (prohibiting disclosure of internal government documents in connection with investigating or prosecuting the case).

---

[1] The Department subsequently amended the Protocol to reduce the Attorney General's role but not that of CCS.  *See generally* J.M. §§ 9-10.070 and 9-10.080.  The description of the Protocol, as applied to Rogers' case, relies explicitly on the then-prevailing authority, the U.S. Attorney's Manual and uses the past tense regardless of prevailing rules.

On September 16, 2014, CCS Trial Attorney James D. Peterson was assigned to facilitate the capital case review of Rogers's case. *United States v. Rogers*, 2:16-cr-00018-WTL-CMM, ECF Doc. No. 99-1 at ¶ 4 (S.D. Ind., Feb. 12, 2018). During the review, defense counsel provided a written mitigation submission. *Id.* at ¶ 6. Defense counsel also met with the Committee. *Id.* The Committee, which did not include Mr. Peterson, made its recommendation to the Attorney General Loretta Lynch in a memorandum dated April 17, 2015. *Id.* at ¶ 8.

In November 2015, CCS learned that a question had arisen at the executive level of the Justice Department regarding the extent to which Rogers had, before the murder, asked BOP officials to provide mental health treatment that he later refused or the BOP denied. *Id.* at ¶ 9. In response to this question, Mr. Peterson contacted the U.S. Attorney's Office, which provided him with records concerning Rogers' custody in USP-TH. *Id.* at ¶ 10. Those records were possessed by Rogers, cited in his mitigation presentation, and thereafter transmitted to the Attorney General. To develop information from the documents, Mr. Peterson—with his supervisors' knowledge—contacted BOP employees named in the records. *Id.* at ¶ 12. Several of those people did not recall any pertinent contact with Rogers or had no recollection beyond the contents of the records. *Id.* at ¶ 13. None of the interviewees offered facts that would exculpate Rogers or impeach the government's witnesses against him. *Id.* at ¶ 13. For those persons who had substantive recollections, Mr. Peterson noted their comments in a word processing document that became a supplemental memorandum for the Attorney General. *Id.* at ¶ 14.

On November 17, 2015, Peterson provided the supplemental memorandum to a supervisor, who forwarded it to the Attorney General. Peterson saved an electronic copy of the supplemental memo in a computer drive accessible to all CCS staff. *Id.* at ¶ 15. On January 19,

2016, Attorney General Lynch authorized the United States Attorney to seek the death penalty against Rogers.

On August 17, 2017, Peterson prepared a memorandum for disclosure to Rogers' counsel. *Id.* at ¶¶ 26-29. The memo summarized Peterson's contacts with BOP personnel but was sanitized of privileged communications included in the document he had prepared for the Attorney General. The sanitized memorandum was provided by CCS to the U.S. Attorney's Office on August 17, 2017, and, again, on January 17, 2018, for disclosure to Rogers.

On January 29, 2018, Rogers' counsel moved to strike the notice of intent to seek the death penalty ("NOI") based on alleged wrongdoing by Attorney Peterson. *United States v. Rogers*, 2:16-cr-00018-WTL-CMM, ECF Doc. No. 92. As the basis of his claims, Rogers relied on an affidavit from a former CCS attorney, Amanda Haines. The affidavit was filed in support of a meritless lawsuit advanced by Jacabed Rodriguez-Coss, another past CCS employee who alleged gender discrimination by CCS management. *See generally Rodriguez-Coss v. Barr*, 776 F. App'x 717, 718 (2d Cir. 2019) (holding that plaintiff failed to demonstrate discriminatory conduct: "In light of Rodriguez-Coss's resistance to trying the [an assigned] case and the repeated criticisms she received from federal judges for failing to meet court deadlines, we agree with the District Court that Rodriguez-Coss has failed to meet her burden"). Haines' affidavit alleged that Peterson had engaged in misconduct by interviewing witnesses in the *Rogers* case without a law enforcement agent present, destroying his interview notes, and neglecting to memorialize his conversations.

6

In light of Haines' allegations, the *Rogers* court allowed depositions of her and Peterson[2] to determine whether the government had committed misconduct and whether the record required further development.  *United States v. Rogers*, 2:16-cr-00018-WTL-CMM, ECF Doc. No. 243 at 2.  The depositions transcripts and video recordings were provided to the Court and sealed pursuant to Rogers' request.  *United States v. Rogers*, 2:16-cr-00018-WTL-CMM, ECF Doc. Nos. 288, 290, 296, & 298.  The government also requested that the Court enter a protective order regarding the depositions, but the Court never ruled on that motion, perhaps deeming the issue moot because the depositions were sealed.  *United States v. Rogers*, 2:16-cr-00018-WTL-CMM, ECF Doc. No. 294.  The Court thereafter ordered an evidentiary hearing to assess the credibility of witnesses and clarify certain issues.  *United States v. Rogers*, 2:16-cr-00018-WTL-CMM, ECF Doc. No. 309 at 1.  Prior to the hearing, Attorney General William Barr authorized the U.S. Attorney to withdraw the NOI and enter a plea agreement with Rogers.  *United States v. Rogers*, 2:16-cr-00018-WTL-CMM, ECF Doc. Nos. 388, 393.  The withdrawal obviated the hearing, and Rogers eventually pled guilty and received a life sentence.  Final judgment was entered on May 8, 2019.  *United States v. Rogers*, 2:16-cr-00018-WTL-CMM, ECF Doc. No. 396.

Due to the nature of the allegations, Attorney Peterson self-reported the claim of misconduct on or about February 1, 2018, to the Office of Professional Responsibility ("OPR") at the Department of Justice.  On September 30, 2019, OPR advised Peterson that after reviewing the discovery materials, court filings, declarations, and several deposition transcripts, further investigation was unlikely to result in a finding of professional misconduct and that OPR had

---

[2]   The *Rogers* court also allowed depositions of AUSA James Warden (the prosecutor initially assigned to the case) and Dr. Stephen Eckert, a BOP psychologist.

closed the matter.  OPR again reviewed the matter in greater detail as part of an expanded investigation following additional allegations by defense counsel.  On August 25, 2022, OPR advised Peterson that upon further review, it had again concluded that with respect to Peterson's conduct, there was insufficient evidence to support the allegation that he engaged in professional misconduct and that OPR considered the matter closed.

## ARGUMENT

Hall requests leave to intervene in the *Rogers* case and to unseal all depositions as possible factual bases for § 2255 claims.  The Court should deny his motion for several reasons.  First, Hall lacks constitutional standing to seek unsealing in this closed case.  Second, Hall does not have a cognizable right to intervene in a criminal proceeding.  Third, to the extent Hall seeks to vindicate the public's right to access, his motion to intervene is untimely.  Finally, neither Hall nor Rogers have presented valid justifications for unsealing the documents.

## I.      Hall Lacks Standing Under Article III

Article III of the United States Constitution only allows the exercise of federal court power over "cases" or "controversies."  *See Bond v. Utreras*, 585 F.3d 1061, 1068 (7th Cir. 2009) (citing *Hein v. Freedom From Religion Found., Inc.*, 551 U.S. 587 (2007)).  Valid cases, in turn, require plaintiffs with "standing."  *Id*.  That standing requirement applies to third parties seeking to intervene in a dismissed case, as the previous "case" or "controversy" has been extinguished by its dismissal.  *See id.* at 1071-72 (holding that third parties seeking to challenge protective orders in closed cases must establish standing under Article III); *see also McMillan v. Hyzy,* 738 F. App'x 365, 366 (7th Cir. 2018) (citing *Bond* for the proposition that "[s]tanding is required for intervention as of right and for permissive intervention under most circumstances.").  Intervenors must establish standing even where the "existing parties remain in the case."  *See City of*

8

*Chicago v. FEMA*, 660 F.3d 980, 984 (7th Cir. 2011) (discussing disagreement among the circuit courts and noting the Seventh Circuit position).

To establish standing, a party must demonstrate "an injury-in-fact capable of being redressed by a favorable decision of the court." *Bond*, 585 F.3d at 1072 (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)). Standing does not turn on the merits of a party's claim, but rather the nature and source of the claim, and the actual or threatened injury may "exist solely by virtue of 'statutes creating legal rights, the invasion of which creates standing.'" *Warth v. Seldin*, 422 U.S. 490, 500 (1975) (quoting *Linda R.S. v. Richard D.*, 410 U.S. 614, 617 n.3 (1973)).

Here, Hall seems to rely on the right of access to court records. *See* Doc. No. 2 at 6-7. However, he lacks a cognizable interest in the documents to establish standing to intervene.

Citizens enjoy common law and First Amendment rights to access documents filed in court. *See Bond*, 585 F.3d at 1073-74. Those general rights are "enough to give members of the public standing to attack a protective order that seals this information from public inspection." *Id*. at 1074. But those rights do not attach to all documents generated through litigation. Instead, the "public's right of access is limited to traditionally publicly available sources of information, and 'discovered, but not yet admitted, information' is not 'a traditionally public source of information.'" *Id*. (quoting *Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 33 (1984)). Because discovery materials, such as depositions, were not traditionally open to the public at common law, there is no public right to access those materials before they enter the judicial record. *See Seattle Times Co.*, 467 at 33; *Baxter Int'l, Inc. v. Abbott Labs.*, 297 F.3d 544, 545 (7th Cir. 2002).

In *Bond*, a third party sought to intervene in a closed civil case to obtain documents that were never filed on the court's docket. *Bond*, 585 F.3d at 1074. As part of its standing analysis,

9

the court evaluated whether any right of access to unfiled discovery materials existed under common law, statute, or the First Amendment. *Id*. at 1075-77. The Seventh Circuit concluded that third parties have no legally enforceable interest in unfiled discovery materials, and therefore cannot establish standing to intervene for the purpose of obtaining such materials. *Id.* The *Bond* court noted that entry on the court docket, by itself, does not transform discovery materials into "judicial records," to which the right of access attaches: the public does not have a right even to discovery material that a judge reviews in the course of discovery proceedings. *Id*. at 1075 n.8.

Thus, the right of access turns, not on public filing, but on a record's characterization as a "judicial document." *See S.E.C. v. TheStreet.Com*, 273 F.3d 222, 232 (2d Cir. 2001) (discussing a rule that publicly accessible judicial documents are those that are "filed [with the court that are] relevant to the performance of the judicial function and useful in the judicial process."); *see also Chi. Tribune Co. v. Bridgestone/Firestone, Inc.*, 263 F.3d 1304, 1312-13 (11th Cir. 2001) ("material filed with discovery motions is not subject to the common-law right of access, whereas discovery material filed in connection with pretrial motions that require judicial resolution of the merits is subject to the common-law right."). Courts have similarly held that "judicial documents" are those that a court relies upon in resolving motions or "exercise[ing] of its supervisory powers." *See Brown v. Maxwell*, 929 F.3d 41, 49 (2d Cir. 2019); *see also Estate of Martin Luther King, Jr., Inc. v. CBS, Inc.*, 184 F. Supp. 2d 1353 (N.D. Ga. 2002) (discovery materials submitted as part of pretrial motions that the court must resolve on the merits are "judicial," but not materials submitted in support of discovery motions").

The depositions at issue here are not judicial, because it is not apparent that the Court relied upon them in resolving a substantive motion or exercising its judicial authority. The depositions related to Rogers' motion to strike the NOI. But the government's voluntary

dismissal of the NOI mooted the motions and thereby deprived the depositions of any relevance. Indeed, the Court ordered the depositions "to determine whether an evidentiary hearing will be required on Rogers' misconduct allegations," *United States v. Rogers*, 2:16-cr-00018-WTL-CMM, ECF Doc. No. 243 at 2. Its decision to schedule that hearing indicates the depositions were inadequate to resolve the motion to strike the NOI. And, as the Court never held an evidentiary hearing, the depositions ultimately played no role in a judicial resolution of the misconduct allegations, much less the case against Rogers. The depositions are not judicial documents and not subject to the public right of access. With no cognizable right of access to the documents, Hall lacks standing to intervene in this case.

## II.       Hall Cannot Intervene in a Closed Criminal Proceeding

Assuming Hall had standing to intervene, he could not do so in a closed criminal case as a private individual.

No statutes or procedural rules allow intervention in a criminal proceeding. *See United States v. Blagojevich*, 612 F.3d 558, 559 (7th Cir. 2010). However, "courts have permitted intervention when the potential intervenor has a legitimate interest in the outcome and cannot protect that interest without becoming a party." *Id*. Still, the parameters of those rights are ambiguous, with some courts even questioning whether such a right exists at all. *See In re Globe Newspaper Co.*, 920 F.2d 88, 90 (1st Cir., 1990) ("the right of a non-party to intervene in a criminal proceeding is doubtful"); *see also United States v. Fast*, 876 F. Supp. 2d 1087, 1088 n.1 (D. Neb. 2012) (doubting that a victim had a right to intervene in a criminal proceeding). The allowance for intervention in criminal cases, however ad hoc, has generally related to media interests in the proceedings. *See, e.g., Blagojevich*, 612 F.3d at 559 (addressing intervention where media groups sought to access juror names); *In re Associated Press*, 162 F.3d 503, 505-06

11

(7th Cir. 1998) (recognizing the propriety of intervention where a media outlet opposed allowing state official's testimony by video deposition and sought release of sealed records); *see also United States v. Ford*, 2008 WL 11351617 at *2 (M.D. Tenn., Feb. 26, 2008) ("Intervention in a criminal case is generally limited to situations in which a media outlet seeks access to closed proceedings or sealed documents . . . or cases in which an individual or company seeks to protect privileged or confidential information seized during a criminal investigation.").

No body of case law establishes an individual's right to intervene in a criminal case to obtain sealed records for private use. In fact, the United States District Court for the Eastern District of Wisconsin rejected that very proposition. In *United States v. Collins*, a firearms dealer sought to intervene in a closed criminal case to obtain evidence with which to defend himself in a civil suit instituted by two police officers. *United States v. Collins*, No. 09–CR–155, 2013 WL 4780927 at *1 (E.D. Wisc., Sept. 5, 2013). The officers had been shot with a firearm that Jacob Collins purchased from the dealer's store and gave to the shooter. *Id*. Collins was charged with making false statements to a firearms dealer, who sought to unseal a psychological report from the criminal case. The dealer asserted the report would establish that Collins, by dint of reading deficits, did not understand the questions on the firearms purchase forms. *Id*.

The court observed the dearth of law to authorize intervention in a criminal proceeding and stated the general rule: "private citizens lack a judicially cognizable interest in the prosecution of another." *Collins*, 2013 WL 4780927 at *1 (citing *Linda R.S.*, 410 U.S. at 619). The court recognized the rights of media outlets to intervene in criminal proceedings and noted that the gun dealer claimed a right as a member of the public and as a private party to the lawsuit. *Id*. at 2. The court found that the dealer "provide[d] no authority for permitting a private party to intervene in the manner and for the purpose he suggests." *Id*. The court discussed cases in

12

which a third party was permitted to intervene in a criminal case to prevent the disclosure of materials—a defensive intervention—and found that same interests do not attach to affirmative intervention, especially when the dealer could obtain the information through other means. *Id*.

The same logic applies here. Hall's motion mentions the public interest in the sealed documents, but his interest stems from a desire to advance his own litigation. He even states that "the information in these sealed depositions is highly relevant to [his] litigation." Doc. 2 at 6. He states that the depositions are relevant because "Mr. Peterson may have committed misconduct in Mr. Hall's case." *Id.* Indeed, defense counsel state that they are seeking intervention in their capacity as Hall's § 2255 attorneys. *Id*. at 1. Defense counsel also state that "the public, and specifically Mr. Hall, unquestionably have strong interests in documents related to a possible pattern of prosecutorial misconduct in death penalty cases." *Id*. at 7. But this statement elides the significant difference between those interests: the public could have an interest in the workings of the criminal justice system, but Hall has an interest in obtaining evidence for his private litigation. As *Collins* makes clear, Hall cannot simply adopt the mantle of the public's interest to vindicate his own endeavor.

No authority allows Hall to intervene in a closed criminal proceeding to obtain evidence sealed evidence for his own purposes. He does not fit within the narrow category of litigants permitted to insert themselves in criminal prosecutions for public benefit, and the Court should therefore deny the motion to intervene.

### III.    Hall's Motion is Untimely[3]

---

[3] In contrast, as discussed below, Hall fails in his arguments that he is entitled to unsealing in aid of his § 2255 litigation because his assertions are premature.

Even if this Court determines that Hall has standing and a basis for intervention on behalf of the public, it should deny his motion as too late. Due to the ad hoc nature of intervention in criminal cases, there is no prescribed time limit. However, the Seventh Circuit has held in the context of sealing juror names, "Once the judge not only flags an issue as important but also sets a schedule for its resolution, the time has come to intervene. People potentially affected by the decision can't sit on the sidelines, as if intervention were a petition for rehearing." *Blagojevich*, 612 F.3d 558, 561.

The *Rogers* case was closed in 2019. As Hall notes, public interest in the allegations against CCS attorneys may have existed in 2018, when *The New York Times* published an article, cited by Hall, that mentions the allegations against Peterson. Notably, the article mentions the allegations in reference to Rodriguez-Coss's meritless discrimination suit. Any party seeking to unseal documents for public consumption could have and should have done so at that time—not years after the resolution of *Rodriguez-Coss v. Barr*, when every person mentioned by name in the article has left CCS. Indeed, Rogers moved to seal the depositions almost a year <u>after</u> *The New York Times* published its article. In that regard, any newfound concern of his for a right of public access rings hollow.

To the extent Hall seeks to unseal on that basis now, the motion is untimely.

## IV.     Hall's and Rogers' Requests to Unseal are Lack Merit In any Event

Assuming without conceding that Hall has standing to intervene, is entitled to intervene, and has timely moved to intervene, the Court should still deny his and Rogers' motions on the merits.

The standard for unsealing judicial documents depends on the source from which the right to access the records springs. Courts have generally recognized two sources of the right of

14

access: common law and the First Amendment. *See In re Associated Press*, 162 F.3d at 506; *United States v. Corbitt*, 879 F.2d 224, 228 (7th Cir. 1989).

**A. Common Law**

The Supreme Court recognized a "common law right of access" in *Nixon v. Warner Communications, Inc.,* 435 U.S. 589, 597 (1978), which includes the right to "inspect and copy public records and documents, including judicial records and documents." That right is not, however, absolute, and courts have "supervisory power over [their] own records and files, and access has been denied where court files might have become a vehicle for improper purposes." *Id*. at 598. Therefore, the "discretionary decision whether to release judicial records should be informed by a 'sensitive appreciation of the circumstances that led to . . . [the] production [of the particular document in question.'" *Corbitt*, 879 F.2d at 228 (quoting *Nixon*, 435 U.S. at 598). The Seventh Circuit has recognized that the common law right of access creates a "strong presumption in favor of public access to materials submitted as evidence in open court." *Id.* (citing *United States v. Edwards*, 672 F.3d 1289, 1294 (7th Cir. 1982)). But that presumption does not apply to "materials properly submitted to the court under seal." *Id*. Instead, a party seeking disclosure of such documents must "make a specific showing of need for access to the document." *Id*. The party may not rely upon presumptions of access. *Id*.

Here, neither Hall nor Rogers contend that the Court improperly sealed the depositions. Indeed, Rogers requested the sealing. As such, they are materials "properly submitted to the court under seal." Thus, Hall and Rogers must make a specific showing of their need for the documents. They fail to do so.

Hall and Rogers refer to the purported need of the public to gain information about the allegations of misconduct in the *Rogers* case and death penalty prosecutions. And Hall mentions

15

his own speculative desire for information in service of his private litigation aims. Neither alleged interest warrants unsealing. As to the public interest, the claims are stale—neither *The New York Times* nor any other media source sought to investigate this aspect of a public exposé of CCS, which now five years later, has new management and largely new personnel. General references to a public interest, either long vindicated or long forgotten, do not demonstrate a compelling need for unsealing the depositions.

Of course, Hall's own private interest will not warrant unsealing. In fact, Hall's expressed rationale—that unsealing could fortify a § 2255 claim—counsels *against* the request. Rule 6 of the Rules Governing § 2255 Proceedings provides that discovery can only be conducted if authorized by the presiding court. A § 2255 movant "is not entitled to discovery as a matter of ordinary course." *Bracy v. Gramley*, 520 U.S. 899, 904 (1997). Rather, he must show "good cause," which only exists where "specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate he is . . . entitled to relief. *Id*. at 908-09 (quotation marks omitted).

At this point, Hall has demonstrated no cause for disclosure of any document, and this Court, which has no familiarity with his trial, should not determine whether his claims justify discovery. Hall has not filed a motion to vacate and, therefore, has not set out any specific allegations that could provide good cause for discovery. Even if he had, the court that tried Hall must determine whether his claims justify discovery, a determination that will turn on the apparent merit of his arguments.

At this point, Hall's allegations amount to no more than a bare assertion that because Attorney Peterson was accused of misconduct in the *Rogers* case, that accusation could give rise to a legitimate claim in his own case—which took place several years before the *Rogers* case.

Those assertions rely on unsupported supposition, including that Attorney Peterson ever participated in the discovery process in Hall's case.  Hall offers no facts or argument that would take the bald assertions into the realm of a colorable claim or evidentiary theory.  Hall cannot use a speculative hope that sealed documents he has never seen might afford him a litigation advantage as the basis for unsealing.  By seeking the sealed depositions from this Court, Hall is attempting an end-around federal rules and the oversight of the court that will decide his § 2255 motion, should he file one.  This is an improper purpose and should be rejected.

On the other side of the scale, good reasons exist not to unseal the transcripts. Significantly, the deponents answered questions to which objections were lodged.  Those objections were never resolved, and the transcripts therefore potentially contain responses that should properly be struck and outside of any judicial record, much less public view. *See United States v. Rogers*, 2:16-cr-00018-WTL-CMM, ECF Doc. No. 294 at 2 & n.1 (S.D. Ind., Feb. 22, 2019).  Second, the depositions touched on subjects that are typically confidential, including discussions about investigations by state bars and the Department of Justice's Office of Professional Responsibility. *Id*. at 2.  The government, therefore, has a strong interest in maintaining the confidentiality of the sealed depositions.

Neither Hall nor Rogers can show a specific need for the depositions, and the interests in maintaining the seal are strong.  The Court should, thus, reject unsealing as requested under the common law right of access.[4]

**B.  First Amendment**

---

[4]  Hall is not without recourse.  If he files his § 2255 motion to vacate and demonstrates good cause, Hall may seek leave from the habeas court to conduct discovery (to include, perhaps, depositions) of Attorney Peterson or any other individual pertaining to the precise issues of Hall's case and under terms set forth by the habeas court.

Whether an individual has a First Amendment right to court records turns on whether the document or proceeding has "historically been open to the press and general public" and whether "public access plays a significant positive role in the functioning of the particular process in question." *See Press-Enterprise Co. v. Superior Court of California for Riverside County*, 478 U.S. 1, 8 (1986).  The First Amendment right of public access attaches only if the material in question satisfies both inquiries.  *Id*. at 9.

The sealed depositions satisfy neither.  Depositions were not proceedings open to the public at common law, and they are generally conducted privately in modern practice.  *See Seattle Times v. Rhinehart*, 467 U.S. 20, 33 (1984).  Indeed, at common law, "pretrial proceedings were closed to the public."  *Bond*, 585 F.3d at 1074 (citing *Gannett Co., Inc. v. DePasquale*, 443 U.S. 368, 389 (1979)).  There is therefore no basis for concluding that a deposition or transcript of a deposition, even a deposition to determine the need for an evidentiary hearing, would be historically open to the public.

Moreover, there is no basis for concluding that public access to a deposition would significantly enhance the judicial process.  In the civil context,

> if such access were to be mandated, the civil discovery process might actually be made more complicated and burdensome than it already is ... The public's interest is in seeing that the process works and the parties are able to explore the issues fully without excessive waste or delay.  But rather than facilitate an efficient and complete exploration of the facts and issues, a public right of access would unduly complicate the process. It would require the court to make extensive evidentiary findings whenever a request for access was made, and this could in turn lead to lengthy and expensive interlocutory appeals.

*Anderson v. Cryovac, Inc.*, 805 F.2d 1, 12 (1st Cir. 1986).

Because depositions have not been historically open to the public, and because there is no basis for suggesting that public access to depositions would play a significant

positive role in the judicial process, no First Amendment right of public access attaches to the sealed depositions at issue here.  Hall's and Rogers' motions should be denied.

**C. Assuming, Arguendo, the Court Unseals the Depositions, it Should do so Subject to a Protective Order**

This Court should deny the motions.  However, if the Court orders unsealing, the government requests that it do so subject to a protective order.  As discussed above, the depositions touched on sensitive topics, and contain questions and answers that garnered unresolved objections.  Any unsealing should therefore be done in conjunction with the imposition of the following restrictions:

- Copies of the referenced transcripts and audio/video recordings shall be used solely and exclusively in connection with Hall's motion to vacate under § 2255 (including investigation, hearing, and appeal) and not for any other purposes. If necessary in preparation for future proceedings, the deponents shall be allowed to review the transcript and audio/video recordings of his/her own deposition.

- Copies of the deposition transcripts and audio/video recordings shall be maintained by Hall's attorneys in person, at their place of business. Hall's attorneys may provide redacted deposition transcripts (NOT the audio/video recordings) to prison officials at for Hall's use, but the transcripts will be maintained at USP-TH in accordance with its policies and sanitized of the deponents' personally identifiable information.

- A copy of this protective order shall be kept with the copies of the deposition materials at all times.

- In no event shall the parties in this cause and/or the deponents disclose or describe any of the referenced transcripts and audio/video recordings to any other person,

entity, or other court or in any other legal proceedings, absent notice to and permission from this Court.

- Counsel shall promptly notify this Court if the transcripts or audio/video recordings are disclosed to anyone not designated by this Order or further order of the Court, either intentionally or unintentionally.

- At the end of the § 2255 proceedings, Hall's attorneys shall destroy the documents.

These restrictions are necessary to prevent disclosure of confidential information.

**CONCLUSION**

Hall lacks standing to obtain the documents at issue, he has no right to intervene for the purpose of obtaining the depositions for use in his own litigation, any intervention on behalf of the public is untimely, and he cannot establish an entitled to the documents under common law or the First Amendment.  The Court should deny the motion in full or, at a minimum, impose a protective order to limit dissemination of private information.

Respectfully submitted,

ZACHARY A. MYERS
United States Attorney

By:   /s/ William L. McCoskey
      William L. McCoskey
      Brian Reitz
      Assistant United States Attorneys


      /s/ Aaron J. Stewart
      Aaron J. Stewart
      Trial Attorney, Capital Case Section
      United States Department of Justice

**CERTIFICATE OF SERVICE**

I certify that on January 22, 2024, a copy of the foregoing document was filed electronically.  Notice of this filing will be sent to the parties of record by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

/s/Aaron J. Stewart
Aaron J. Stewart
Trial Attorney, Capital Case Section
United States Department of Justice